**NATIONAL ASSOCIATION OF PHARMACEUTICAL MANUFACTURERS and National Pharmaceutical Alliance, Plaintiffs-Appellants,**

v.

**FOOD AND DRUG ADMINISTRATION, Defendant-Appellee.**

**No. 204, Docket 80–6090.**

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1980.

Decided Jan. 5, 1981.

Rehearing and Rehearing In Banc Denied April 10, 1981.

Jacob Laufer, New York City (Bass, Ullman & Lustigman, Milton A. Bass, and Steven R. Trost, New York City, of counsel), for plaintiffs-appellants.

878

Harvey J. Wolkoff, Asst. U. S. Atty., S.D.N.Y., New York City (John S. Martin, Jr., U. S. Atty., S.D.N.Y., Peter C. Salerno, Asst. U. S. Atty., New York City, Nancy L. Buc, Chief Counsel, Kathleen A. Blackburn, Asst. Chief Counsel, Food and Drug Administration, Rockville, Md., of counsel), for defendant-appellee.

Before FRIENDLY and TIMBERS, Circuit Judges.*

FRIENDLY, Circuit Judge:

In 1962 Congress enacted various amendments to the Federal Food, Drug, and Cosmetic Act of 1938 (the Act), 52 Stat. 1040, amended 76 Stat. 780, to "strengthen and broaden existing laws in the drug field so as to bring about better, safer medicine and to establish a more effective system of enforcement of the drug laws." S.Rep.No. 1744, 87th Cong., 2d Sess. 8, [1962] U.S.Code Cong. & Adm.News, p. 2884. Among the amendments was a section by which a drug is deemed adulterated if its packaging, processing, holding or manufacturing fail to conform to "current good manufacturing practice [(CGMP)] to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess". § 501(a)(2)(B), 21 U.S.C. § 351(a)(2)(B). The Food and Drug Administration (FDA) issued its first regulations under this section in 1963, 28 F.R. 6385. In

February, 1976, FDA announced a proposal to revise and update the then current CGMP regulations, 41 F.R. 6878. This proposal, which provided for the notice and comment procedures contemplated by 5 U.S.C. § 553, announced:

The Commissioner intends for CGMP regulations to become binding specific requirements that must be complied with; failure to do so shall render a drug product adulterated under section 501(a)(2)(B) of the [Act] . . . . Binding regulations will . . . serve to inform courts of FDA's expert judgments regarding current good manufacturing practice for drugs in the United States; this will expedite and assist enforcement proceedings to assure compliance with section 501(a)(2)(B) of the act.

The FDA received numerous comments both upon the substance of its requirements and upon its proposal that the new CGMP regulations should have the force of law.[1] In an extensive preamble to the new regulations it set forth a legal analysis supporting its view that it had power to issue binding regulations, 43 F.R. at 45021–25, and the reasons why it believed binding rather than merely interpretive regulations would be in the public interest.[2] The regulations, now appearing at 21 C.F.R. Parts 210 and 211 (1980), were published on September 29, 1978, to be effective March 28, 1979, 43 F.R. 45014. They cover a broad spectrum of affairs, including requirements.

---

* Judge Newman having recused himself in this case, it is being disposed of by the two other judges on the panel, who are in agreement. See Second Circuit Rule § 0.14(b).

1. A concise formulation of the distinction between "binding" and "interpretive" rules is supplied by the Final Report of the Attorney General's Committee on Administrative Procedure 100 (1941):

Administrative rule-making . . . includes the formulation of both legally binding regulations and interpretative regulations. The former receive statutory force upon going into effect. The latter do not receive statutory force and their validity is subject to challenge in any court proceeding in which their application may be in question. The statutes themselves and not the regulations remain in

theory the sole criterion of what the law authorizes or compels and what it forbids.

2. The most significant justification for having the regulations binding is to minimize the burden on the government and on the courts in a case where a violation does occur. When the regulations are merely interpretive, the agency must provide expert testimony in each trial to demonstrate what the current good manufacturing practice in the industry is, notwithstanding the regulation. The cost of locating and preparing such expert witnesses and bringing them to the trial, as well as the judicial time taken in hearing these witnesses, would be eliminated by having binding regulations.
43 F.R. 45025 (1978).

for personnel practices, record keeping, building design, and procedures for the control of drug production, packaging and labeling.

In this action in the District Court for the Southern District of New York, wherein jurisdiction was predicated on 28 U.S.C. §§ 1331(a) and 1337, the National Association of Pharmaceutical Manufacturers and the National Pharmaceutical Alliance, both trade associations, sought a declaration that FDA's attempt to give binding effect to the new CGMP Regulations was beyond its authority. The FDA moved to dismiss the complaint for failure to state a claim upon which relief can be granted, F.R.Civ.P. 12(b)(6). Chief Judge MacMahon granted the motion in a brief opinion, D.C. 487 F.Supp. 412 (1980), this appeal followed, and we now affirm.[3]

Two different subsections of § 701 confer rulemaking authority upon the FDA. Section 701(a) provides:

The authority to promulgate regulations for the efficient enforcement of this chapter, except as otherwise provided in this section, is vested in the Secretary [of Health and Human Services].

The effect of § 4 of the Administrative Procedure Act of 1946 (APA), now 5 U.S.C. § 553, is to require that rulemaking under § 701(a), with certain exceptions, including "interpretative rules", follow an informal notice and comment procedure, which was done here. Section 701(e) provides that "[a]ny action for the issuance, amendment, or repeal of any regulation" under various sections of the Act of which § 501(a)(2)(B) is not one, shall follow a complex procedure which has been read to include a trial-type hearing; § 701(f) provides that review of any order resulting from such rulemaking lies in a court of appeals. See *National Nutritional Foods Ass'n v. FDA*, 504 F.2d 761, 771–74 (2 Cir. 1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). Admittedly § 701(e) procedures were not followed here and the FDA's authority to give binding effect to the CGMP regulations at issue must rest on § 701(a).

Reading the language of that subsection, which comes from the Act of 1938, with the eyes of 1980, one would have little difficulty in concluding that the words suffice to empower the Commissioner of the FDA, to whom the Secretary has delegated his powers, 21 C.F.R. § 5.1(a)(1) (1980), to issue regulations, substantive as well as procedural, having the force of law.[4] The com-

---

**3.** We are told that plaintiffs have brought another action in the district court challenging numerous provisions of the CGMP Regulations on the merits. At argument we expressed some doubt whether even under the liberal views with respect to pre-enforcement review announced in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), rev'g *Abbott Laboratories v. Celebrezze*, 352 F.2d 286 (3 Cir. 1965), and *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), aff'g *Toilet Goods Ass'n v. Gardner*, 360 F.2d 677 (2 Cir. 1966), where plaintiffs challenged the substance of the regulations, the district court could properly entertain an action which did not challenge any substantive provision but merely questioned the promulgator's declaration of their legal effect. Both sides have asked us to sustain the district court's entertaining the action, citing *Central Hudson Gas & Electric Corp. v. EPA*, 587 F.2d 549, 558 (2 Cir. 1978), which held that a controversy whether the EPA or the New York State Department of Environmental Conservation had jurisdiction over certain applications to discharge pollutants into the Hudson River was ripe for judicial review. Plaintiffs

say that it is important for them to know in the conduct of their business whether the CGMP regulations are authoritative or merely interpretive. Non-compliance with the regulations entails heavy legal and practical penalties for introducing "adulterated" materials into commerce, see *Gardner v. Toilet Goods Ass'n, supra*, 387 U.S. at 172, 87 S.Ct. at 1529. A manufacturer might be willing to take these risks if he could prevail by showing that he was conforming with what current good manufacturing practice in the industry in fact was, but not if his only avenue of escape was by showing that the regulation was unlawful within 5 U.S.C. § 706(2). We conclude that although the case presses the notion of ripeness further than any predecessor known to us, the district court had power to entertain the complaint.

**4.** This statement will be subjected to more extended consideration in connection with plaintiffs' argument that the 1979 decision in *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208, established a new and restrictive approach to Congressional grants of rulemaking power—an argument which we discuss and reject at the end of this opinion.

prehensive opinion of Judge J. Skelly Wright in *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C.Cir.1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), catalogued the many instances in which general statutory provisions not differing essentially from § 701(a) have been held to endow agencies with power to issue binding rules and regulations. In the interest of historical accuracy, it should be noted that at one time it was widely understood that generalized grants of rulemaking authority conferred power only to make rules of a procedural or an interpretative nature, and not binding substantive regulations, for which a specific delegation was thought necessary. See, e. g., Alvord, Treasury Regulations and the Wilshire Oil Case, 40 Colum.L.Rev. 252, 259–61 (1940); Lee, Legislative and Interpretive Regulations, 29 Geo.L.J. 1, 21 (1940); Final Report of the Attorney General's Committee on Administrative Procedure, *supra*, at 98 & nn.18, 19. The Supreme Court's decision in *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), which in retrospect seems to have inaugurated the modern approach, was not universally so recognized at the time, since the Court there relied in part on more specific grants of rulemaking power and the regulations at issue in that case, although substantive in effect, were clothed in the garb of procedural rules.

In 1953, however, the Court decided *American Trucking Ass'ns v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337, in which the issue was whether the Interstate Commerce Commission, under the Motor Carrier Act of 1935, had the authority to promulgate rules restricting leasing and interchange practices in the trucking industry. In an outstanding opinion by Justice Reed, the Court expressly rejected the arguments that the Commission had exceeded its authority because the statute lacked an express delegation of power to regulate the practices in question, and because the general rulemaking power the statute did confer was intended only for rules governing agency procedure:

> As a matter of principle, we might agree with appellants' contentions if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil to be corrected. But no great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. . . .

> We hold then that the promulgation of these rules for authorized carriers falls within the Commission's power, despite the absence of specific reference to leasing practices in the Act. . . . The grant of general rule-making power necessary for enforcement compels this result.

*Id.* at 309–10, 312, 73 S.Ct. at 314, 315. As documented by Judge Wright in *National Petroleum Refiners*, this generous construction of agency rulemaking authority has become firmly entrenched.[5]

Beyond this there is formidable authority to the effect that § 701(a) itself is a grant of power to issue binding regulations. The first is the statement in *Abbott Laboratories, supra*, 387 U.S. at 151–52, 87 S.Ct. at 1516–1517, adverting to certain drug labeling regulations issued pursuant to § 701(a):

> These regulations are not meant to advise the Attorney General, but purport to be directly authorized by the statute. Thus, if within the Commissioner's authority, they have the status of law and violations of them carry heavy criminal and civil sanctions.

The Court also spoke of the regulations as "self-operative" rules "that must be followed by an entire industry". *Id.* at 147, 87 S.Ct. at 1514. It can be argued that the Court could not really have meant to decide whether the regulations there at issue had

---

**5.** Additions to Judge Wright's list could include *Thorpe v. Housing Authority of City of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); and *Independent Bankers Ass'n v. Heimann*, 613 F.2d 1164 (D.C.Cir.1979), *cert. denied*, —— U.S. ——, 101 S.Ct. 84, 66 L.Ed.2d 26 (1980).

the "status of law" since the Government had urged throughout the case that they were merely interpretive, the court of appeals had so held, 352 F.2d at 289–90, and the petitioner had not seriously challenged this, and also because in *Toilet Goods Ass'n v. Gardner*, 360 F.2d 677, 686, heard and decided in the Supreme Court, 387 U.S. 158, 167, 87 S.Ct. 1520, 1526, 18 L.Ed.2d 697, 704, together with *Abbott Laboratories*, we had said that we saw "little profit in debating the point, much discussed by the parties, whether the Regulations are 'interpretative' or 'legislative'", since "the interpretative character of a regulation does not necessarily make it unripe for review".[6] However, the Court's remarks are at least impressive dicta operating in the Government's favor here. See *Ciba-Geigy Corp. v. Richardson*, 446 F.2d 466, 467–68 (2 Cir. 1971) (per curiam).

Next came the quartet of cases decided by the Supreme Court in 1973: *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 707; *CIBA Corp. v. Weinberger*, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230; *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235; and *USV Pharmaceutical Corp. v. Weinberger*, 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244. Although Professor Kenneth Culp Davis cites these, along with the passage just quoted from *Abbott Laboratories*, for the proposition that "[r]ules issued under § 701(a) are legislative rules and not merely interpretive", 1 Administrative Law Treatise § 6:8 at 478 (2d ed. 1978), plaintiffs emphasize his remark that "the four cases are weak authority because the regulation rested only in part on § 701(a) and because the Court did not address itself to the question whether § 701(a) was sufficient support for the rules." Examination of the briefs confirms that discussion of § 701(a) and the legislative-interpretive distinction was meagre, the only instance being in the briefs in the *Bentex* case. Still we find it difficult not to see in the passage of Mr. Justice Douglas' opinion quoted in the margin[7] an endorsement of the Government's position that § 701(a) authorized the FDA to issue substantive regulations having the force of law.[8]

In any event this court, in *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975), characterized the 1973 quartet of Supreme Court decisions as having dispelled "[w]hatever doubts might have been entertained regarding the FDA's power under § 701(a) to promulgate binding regulations". *Id.* at 696. The court said: "[o]ur attention has not been directed to anything in the legislative history of §§ 701(a) and (e) that militates against

6. The Toilet Goods Association had argued in the Supreme Court that the regulations had binding effect. Brief for Petitioners at 22–23, 30–35, *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

7. We think that it is implicit in the regulatory scheme, not spelled out in haec verba, that FDA has jurisdiction to decide with administrative finality, subject to the types of judicial review provided, the "new drug" status of individual drugs or classes of drugs. The deluge of litigation that would follow if "me-too" drugs and OTC drugs had to receive de novo hearings in the courts would inure to the interests of manufacturers and merchants in drugs, but not to the interests of the public that Congress was anxious to protect . . . . *Weinberger v. Bentex Pharmaceuticals, Inc.*, *supra*, 412 U.S. at 653, 93 S.Ct. at 2494.

8. We prefer not to rely, as other opinions have done, on the *Hynson* decision itself, since the Court's consideration in that case of the FDA's summary judgment procedures for "new drug" applications did not clearly treat the regulations as either legislative or interpretive in nature, 412 U.S. at 617–22, 93 S.Ct. at 2476–2479, and in any event, the regulations were procedural rather than substantive. Moreover, in its discussion of the Commission's authority to determine "new drug" status and the advantages of proceeding on a comprehensive rather than an individual, case-by-case basis, the Court chose to rely on the agency's power to issue a declaratory order under 5 U.S.C. § 554(e), 412 U.S. at 624–26, 93 S.Ct. at 2480–2481 and not on § 701(a), which the Government in its brief had advanced as an alternative ground. Doubtless this is what Professor Davis had in mind in the passage quoted in the text.

these conclusions",[9] and correctly stated that "over the last decade rule-making has been increasingly substituted for adjudication as a regulatory technique, with the support and encouragement of the courts, at least where the regulation involves specialized scientific knowledge", *id.* at 698, citing, among other cases, Judge Wright's opinion in *National Petroleum Refiners Ass'n v. FTC, supra,* 482 F.2d 672. The decision in *National Nutritional Foods, supra,* thus reinforced our earlier reliance on *Abbott Laboratories* as supporting the Commissioner's power to issue § 701(a) regulations that are binding. See *Ciba-Geigy Corp. v. Richardson, supra,* 446 F.2d at 467–68. In *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 246–48 (1977), we again read the 1938 Act as authorizing the issuance of binding substantive regulations under § 701(a). And in yet another case in which the issue was posed, we cited *National Nutritional Foods* as dispositive. See *National Nutritional Foods Ass'n v. Califano,* 603 F.2d 327, 333 (1979). See also *Cosmetic, Toiletry and Fragrance Ass'n v. Schmidt,* 409 F.Supp. 57 (D.D.C.1976); *American Frozen Food Institute v. Califano,* 555 F.2d 1059 (D.C.Cir.1977) (per curiam); *Cosmetic, Toiletry & Fragrance Ass'n v. State of Minnesota,* 440 F.Supp. 1216, 1221 (D.Minn.1977), aff'd per curiam, 575 F.2d 1256 (8 Cir. 1978); *Almay, Inc. v. Califano,* 569 F.2d 674 (D.C.Cir.1977); *United States v. Articles of Drug Labeled Colchicine,* 442 F.Supp. 1236, 1241 (S.D.N.Y. 1978), aff'd mem. *sub nom. United States v. Consolidated Midland Corp.,* 603 F.2d 215 (2 Cir. 1979); *National Confectioners Ass'n v. Califano,* 569 F.2d 690 (D.C.Cir.1978).

Appellants' claim is that, whether or not the FDA may generally issue binding substantive regulations under § 701(a), although they obviously think it may not, it cannot do so with respect to the CGMP Regulations. In support of this position they rely on the legislative history of the portion of the 1962 amendments that added § 501(a)(2)(B). This is set out in ¶ 35 of the

Preamble to the CGMP Regulations here at issue, 43 F.R. at 45021–23, and we shall now summarize it.

On July 19, 1962, the Senate Judiciary Committee reported out S. 1552, the Senate version of what ultimately became the Drug Amendments of 1962. Section 5 of the bill, after making the substantive amendment adding the current good manufacturing practices requirement, added:

> The Secretary is authorized to issue interpretative regulations, upon notice and in accordance with the procedures set forth in section 4 of the Administrative Procedure Act (5 U.S.C. 1003), which shall in any proceeding involving this paragraph, be prima facie evidence of what constitutes current good manufacturing practice.

The Report accompanying the bill accurately paraphrased this. See S.Rep.No.1744, 87th Cong., 2d Sess. 9 (1962), [1962] U.S. Code Cong. & Admin.News, p. 2890.

On August 21, 1962, the Senate Committee reported out a revised version of the bill. The reworded § 501(a)(2)(B) omitted any reference to regulations. The Committee explained this as follows, S.Rep.No.1744, Part 2, 87th Cong., 2d Sess., pages 3 and 4:

> The President, in the recommendations submitted for the consideration of the committee with his letter of August 3, 1962, proposed a revised version which included the following principal amendments to the reported bill:
>
> (1) It proposed to replace the provisions on regulations with prima facie evidentiary effect with a provision that the adequacy of the quality controls be determined "in accordance with regulations promulgated by the Secretary on the basis of good manufacturing practice" after formal rulemaking procedures, i. e., after affording an opportunity for hearing, and for judicial review on the basis of the hearing record, with respect to such regulations.

> \*  \*  \*  \*  \*  \*

---

**9.** Appellants' brief in that case, prepared by the same firm representing plaintiffs here, made only the most meagre reference to the legislative history of the 1938 Act now so strongly pressed, see *infra.*

The explanation accompanying the recommendations of the President expressed concern lest the language as to interpretative regulations with prima facie evidentiary effect invite endless de novo litigation on the question of what constitutes good manufacturing practice each time there is enforcement action under the new quality control provisions. The committee acceded to the President's request for elimination of the "prima facie" regulatory authority in the bill. It felt, however, on balance, that there was no need for inserting provisions for regulations through formal rulemaking on the subject of what is good manufacturing practice. Section 701(a) (21 U.S.C. 371(a)) now vests in the Secretary "authority to promulgate regulations for the efficient enforcement of this Act." This permits the Department to issue such regulations as it desires and their scope and effect will be the same as that of other regulations issued under such general authority. Numerous regulations have been issued under section 701(a) and have been the subject of consideration and application in the courts in actions arising under the various provisions of the act not now subject to formal rulemaking procedures.

During the floor debate on August 23, Senator Eastland, Chairman of the Judiciary Committee, said on the subject of rulemaking:

The Secretary could use his general rulemaking authority under section 701(a) of the act to announce what he, in the administration of the act, considers to be good manufacturing practice insofar as methods and administration are concerned. As in the case of other regulations, the court in the final analysis will pass upon the scope and effect of such regulations.

108 Cong.Rec. 17365.

A month later the House Interstate and Foreign Commerce Committee reported out H.R. 11581, its version of the Drug Amendments. After defining as adulterated drugs not prepared in conformity with current good manufacturing practice, the House bill would have inserted the words "(as determined in accordance with regulations promulgated by the Secretary)"; it also would have amended § 701(e) to include CGMP Regulations among the categories requiring "formal" rulemaking procedures. The accompanying report accurately paraphrased the bill and expressly stated:

The promulgation of these regulations would be subject to opportunity for hearing and judicial review. Thus, legal action could be brought against firms failing to abide by these standards and against the products they ship.

H.Rep.No.2464, 87th Cong., 2d Sess. 2 (1962).

The House debated the bill on September 27, 1962. Representative Schenck offered an amendment to delete the parenthetical clause in § 501(a)(2) and the amendment to § 701(e). His explanation, so far as here pertinent, was as follows:

My amendment to section 101 of the bill, which was approved by the committee, provides simply that the drug will be deemed to be adulterated and subject to seizure if the methods, facilities, or controls used in the manufacture of the drug do not conform with current good manufacturing practice, as determined in accordance with regulations promulgated by the Secretary.

\* \* \* \* \* \*

The committee adopted an amendment which would make the formal rulemaking procedures of section 701(e) of the Federal Food, Drug, and Cosmetic Act applicable to regulations referred to which may be made pursuant to the above amendment.

I am opposed to the amendment in section 101(b) of the bill which would require the Secretary to hold a formal hearing under section 701(e) of the Federal Food, Drug, and Cosmetic Act in order to issue regulations as to what constitutes current good manufacturing practice. I favor the approach adopted by the Senate under which this determination is made pursuant to section 701(a) of the act.

This procedure permits the Secretary to issue such regulations as he desires and their scope and effect will be the same as that of other regulations issued under such general authority. This procedure is more flexible. Numerous regulations have been issued under this section and they have been the subject of consideration and application in the courts in actions arising under the various provisions of the act not now subject to formal rulemaking procedures.

108 Cong.Rec. 21056–57. Chairman Harris of the House Interstate and Foreign Commerce Committee observed that the Schenck amendment was "taken, in part, from the Senate bill"; and that Representative Schenck had advised him "of the need not to tie this provision in with section 701(e)." 108 Cong.Rec. 21077. The House thereupon adopted the section which, as revised by the Schenck amendment, was the same as the Senate bill and made no mention of regulations.

Little need be said with respect to one argument made on the basis of the legislative history. This is that President Kennedy proposed to the Senate a trade whereby the CGMP regulations would have binding rather than *prima facie* effect but only if they were adopted through the "formal" § 701(e) procedures, and that the Senate cannot be thought to have given him more than he sought—to wit, binding effect but without § 701(e) procedures. We perceive no basis for the latter conclusion. The Senate was free to accept the President's criticism of the *prima facie* language without conditioning the striking of this on adherence to the complicated § 701(e) procedure. The Senate Report shows that this was what it did. The record in the House is even clearer. There the Interstate and Foreign Commerce Committee had adopted the President's proposal but, on hearing Representative Schenck's objection and Chairman Harris' endorsement of it, struck the requirement for § 701(e) procedures.

Indeed, so far as concerns the precise issue here before us, plaintiffs' resort to the legislative history of the 1962 Amendments works against rather than for them. It is clear the 1962 Congress intended to do *something* in response to President Kennedy's request and also that the something was not compulsory resort to the procedure required by § 701(e). Yet there is no substantial difference between the "*prima facie*" evidence standard in the original Senate bill and the "interpretive" limitation urged by plaintiffs.

Plaintiffs' other argument is more impressive, although not sufficiently so. This is that when the 1962 Congress decided to rely on the Secretary's rulemaking authority under § 701(a), it was to that authority as then understood; that the pre–1962 case law established that any substantive regulations issued under § 701(a) could be interpretive only; that the legislative history of the 1938 Act strongly corroborates this; and that the Supreme Court's statements in *Abbott Laboratories* in 1967 and the *Hynson* quartet in 1973 and our own still later decisions are thus not dispositive of the problem in hand. Added support for this argument is sought in the final sentences of the excerpt from the report of the Senate Committee, and in the remarks of Senator Eastland and Representative Schenck, all set out above.

We do not find the pre-1962 decisions with respect to the extent of the Secretary's power under § 701(a) to be so conclusive as plaintiffs assert. Weighing in the Government's favor is *United States v. Sullivan,* 332 U.S. 689, 691 n.2, 68 S.Ct. 331, 333 n.2, 92 L.Ed. 297 (1948), in which the Supreme Court remarked that an inscription on a label appeared to constitute adequate directions for use in compliance with § 502(f)(1) of the Act since the wording of the label was "required by regulation issued by the Administrator pursuant to authority of the Act, 21 C.F.R. Cum.Supp. § 2.106(b)(3)" (1944), a regulation promulgated under § 701(a). See 6 F.R. 1920 (1941). Two courts of appeals applied the standard of review appropriate for binding rules in upholding § 701(a) regulations establishing exemptions from the Act's requirements. *Arner Co. v. United States,*

142 F.2d 730, 734–37 (1 Cir.), *cert. denied*, 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 586 (1944); *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62 (9 Cir. 1951). Less clear in their import and not bolstering either position are *Colgrove v. United States*, 176 F.2d 614 (9 Cir. 1949), which concerned labeling regulations under 21 U.S.C. § 352(f); the court spoke of these both as "interpretative", 176 F.2d at 615 n.3, and as "authoritative", *id.* at 616; and *United States v. Two Articles of Device*, No. 2343 Civ. (E.D. Okla.1949), published in Kleinfeld & Dunn, Federal Food, Drug and Cosmetic Act: Judicial and Administrative Record 1938–1949, at 529 (1949). The court in *Drown v. United States*, 198 F.2d 999 (9 Cir. 1952), *cert. denied*, 344 U.S. 920, 73 S.Ct. 385, 97 L.Ed. 709 (1953), found an "interpretive" labeling regulation to be a reasonable construction of the statute, a decision arguably weighing in favor of the plaintiffs. In addition, the plaintiffs rely on *United States v. Various Articles of Drugs*, 83 F.Supp. 882, 884–85 (D.D.C.1949), and *United States v. 38 Dozen Bottles*, 114 F.Supp. 461, 463 n.1 (D.Minn.1953), district court cases which did indeed speak of § 701(a) regulations as interpretive. In none of the cases we have cited, however, was the issue sharply posed.

An indication of the intent of the 1962 Congress with respect to the scope of the regulatory power conferred by § 701(a) far more persuasive than this inconclusive smattering of cases under § 701(a) itself is furnished by well-known pre-1962 Supreme Court decisions which had held that rulemaking provisions similar to § 701(a) empowered the agency to issue binding rules. We cite as examples *National Broadcasting Co. v. United States, supra*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (FCC's network broadcasting rules); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956) (FCC's limitation on number of broadcasting stations owned); and *American Trucking Ass'ns v. United States, supra*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (ICC's rules governing use by authorized motor carriers of equipment obtained by lease or interchange). See also *SEC v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).[10]

On the other hand plaintiffs seem on solid ground when they contend that if the 1962 Congress had made the detailed examination of the legislative history and contemporary understanding of the 1938 Act, which plaintiffs' counsel have now made at long last, see note 9 *supra*, it might well have concluded that § 701(a) in fact very likely was not intended to confer power to issue binding substantive rules. We shall give only an abbreviated version of what is spelled out in plaintiffs' brief. The story begins in 1933 with the introduction of a bill, S.1944, 73d Cong. 1st Sess., the so-called Tugwell bill, containing a section which was read to give the Secretary of Agriculture power to prescribe binding regulations, see Dunn, Federal Food, Drug, and Cosmetic Act: A Statement of Its Legislative Record 49 (1938) (§ 23(a)), a power the Food and Drugs Act of 1906, 34 Stat. 768, had not conferred.[11] At the next session

---

**10.** Although the regulations in *National Broadcasting* and *Storer Broadcasting* were cast in procedural terms, it was plain that they had vital substantive effect.

**11.** Section 3 of the 1906 Act authorized the Secretaries of Agriculture, the Treasury, and Commerce and Labor (later Commerce) to issue rules and regulations for carrying out the Act's provisions. Plaintiffs contend that *United States v. Antikomnia Chemical Co.*, 231 U.S. 654, 34 S.Ct. 222, 58 L.Ed. 419 (1914), decided that a regulation issued under § 3 was merely interpretive. The Government, supported by commentators, considers the case to have held that § 3 authorized the three Secretaries to issue binding, substantive regulations. See

Hayes & Ruff, The Administration of the Federal Food and Drug Act, 1 Law & Contemp. Probs. 16 (1933); 2 Toulmin, The Law of Foods, Drugs & Cosmetics § 34.2 at 780 (2d ed. 1963). A safer stance is that the rather murky opinion written by Mr. Justice McKenna did not clearly take either position. Lower courts were divided on this question. Compare *United States v. 779 Cases of Molasses*, 174 F. 325 (8 Cir. 1909); and *United States v. 37 One-Pound Packages of Colors* (E.D.Pa.1925), published in White & Gates, Decisions of Courts in Cases under the Federal Food and Drugs Act 1165, 1166 (1934); with *United States v. Piso Co.* (W.D.Pa.1911), published in White & Gates, *supra*, at 319, 321; and *United States v. Trinidad Creamery Co.*

Senator Copeland of the Senate Commerce Committee substituted a different bill, S. 2800, 73d Cong., 2d Sess., proposing the establishment of committees on public health and food standards with the power to veto any regulations proposed by the Secretary of Agriculture. Senator Copeland explained that "the first bill placed in the hands of the Secretary of Agriculture what personally I regard as too great arbitrary power". 78 Cong.Rec. 2728 (1934), reprinted in Dunn, *supra*, at 68. In the next Congress, the Senate passed a similar bill, denominated S. 5, 74th Cong., 1st Sess. The accompanying report submitted by Senator Copeland listed seven areas in which regulations were contemplated, later catalogued in § 701(e), and said:

> While other regulations are authorized for the purpose of making exemptions or for purely administrative operations, the only regulations imposing positive requirements are those listed above.

S.Rep.No.646, 74th Cong., 1st Sess. 10 (1935), reprinted in Dunn, *supra*, at 486. In the House, the attempt to control the Secretary's discretion by the committee structure was abandoned, and the dichotomy later to become §§ 701(a) and (e) was proposed instead. S. 5, 74th Cong., 2d Sess., reported as amended by the House Committee on Interstate and Foreign Commerce 69–70 (May 22, 1936), reprinted in Dunn, *supra*, at 542. The bill to be finally enacted, with

§§ 701(a) and (e) in place, was reported out by the House Committee on Interstate and Foreign Commerce in April, 1938. The end of the story is in House Report No. 2139, 75th Cong., 3d Sess. 9–10 (1938), reprinted in Dunn, *supra*, at 823–24:

> Section 701 relates generally to regulations. In the case of regulations, the violation of which constitutes an offense, it is required that appropriate notice of a public hearing be given and that adequate time shall be given after the promulgation of a regulation before it becomes effective.

> \* \* \* \* \* \*

> Section 701(e), (f), and (g) of the committee amendment set forth the procedure governing the formulation and judicial review of. certain regulations to be issued by the Secretary. . . .

> Such regulations are not merely interpretive. They have the force and effect of law and must be observed. Their violation may result in the imposition of criminal penalties, or in the confiscation of the goods involved if shipped in interstate commerce, or in their exclusion from the country if imported.

Plaintiffs supplement this history with references to instances, not necessary here to recount, wherein the FDA at various times had represented that § 701(a) did not empower it to issue binding substantive regu-

---

(D.Colo.1925), published in White & Gates, *supra*, at 1152, 1154.

Whatever the true status of these § 3 regulations, the Secretary of Agriculture, not content to share regulatory power with the other Secretaries, undertook to issue a wide variety of substantive regulations on his own, especially in the area of food standards. There is no dispute that these regulations were interpretive only, and were intended to be merely advisory. Hayes & Ruff, *supra* at 16, 32 n.71; Cavers, The Food, Drug, and Cosmetic Act of 1938: Its Legislative History and Its Substantive Provisions, 6 Law & Contemp.Probs. 2, 25 (1939); Lee, Legislative and Interpretive Regulations, *supra*, at 7; Davis, Administrative Rules—Interpretative, Legislative and Retroactive, 57 Yale L.J. 919, 932 (1948); 2 Toulmin, *supra*. "During the course of the enactment of the 1906 act numerous attempts were made to in-

clude in it authority for the Secretary of Agriculture to adopt regulations embodying standards. These attempts were all unsuccessful." Lee, *supra*, at 7 (footnote omitted); see also Hayes & Ruff, *supra* at 32. That the regulations were not mandatory was acknowledged by the Department of Agriculture itself; testifying before Congress in 1923, a Department official said of food products regulations:

Those definitions and standards did not have the force nor effect of law and the Department of Agriculture has never presumed for a moment that they do have. They merely serve as an indication of the administrative position taken by the Department in the enforcement of the law.

Hearings before Committee on Agriculture on H.R. 12053, 67th Cong., 4th Sess. 2 (1923), quoted in Lee, *supra*, at 9.

lations, and with citations to secondary sources supporting that view.[12]

A principal difficulty with plaintiffs' argument is that there is no evidence that these arcana concerning the legislative history of the 1938 Act were known to the 1962 Congress. Much water had flowed under the bridge since 1938. The principal consideration in 1938 against permitting the FDA to issue binding substantive rules except by following the complex procedures of § 701(e), namely the absence of any statutorily prescribed procedures under § 701(a), was radically changed when Congress enacted the APA in 1946. Pursuant to § 4 of that Act, now 5 U.S.C. § 553, the FDA, as previously indicated, cannot issue a binding substantive rule under § 701(a) without complying with notice and comment procedures that give affected parties an adequate opportunity to be heard. While the Federal Food, Drug, and Cosmetic Act has not been completely reenacted since 1946, it has been repeatedly amended to give the Secretary new powers. Many of these provisions have expressly authorized him to make implementing regulations, e. g., Color Additive Amendments of 1960, Pub.L.No. 86–618, Title I, § 103(b), 74 Stat. 397 (codified in part at 21 U.S.C. §§ 376(b), (c)); Animal Drug Amendments of 1968, Pub.L. No.90–399, § 101(b), 82 Stat. 342 (codified in part at 21 U.S.C. § 360b(n)); Medical De-vice Amendments of 1976, Pub.L.No.94–295, § 2, 90 Stat. 539 (codified in part at 21 U.S.C. §§ 360c(e), 360e(b)); Infant Formula Act of 1980, Pub.L.No.96–359, § 2, 94 Stat. 1190 (to be codified in part at 21 U.S.C. §§ 412(a)(2), (d)(2), (e)(2), (f)(2)); when Congress has wished this to be done only by following § 701(e) procedures, it has said so, e. g., Color Additive Amendments of 1960, *supra*, 21 U.S.C. § 376(d); Drug Amendments of 1962, Pub.L.No.87–781, Title I, § 131(a), 76 Stat. 780 (codified in part at 21 U.S.C. § 352(n)). When it has provided for regulations but has not required this or, as in the case of the current good manufacturing practice provisions, it has said nothing about regulations, it is more reasonable to believe that Congress meant the FDA to have the same power to issue binding substantive regulations as the Supreme Court had recognized for other agencies beginning with the *National Broadcasting* decision in 1943.

Plaintiffs' argument also goes astray in asking that we disregard subsequent decisions on the effect of § 701(a) regulations for the purpose of determining the intent of the 1962 Congress. It is true, of course, that decisions dating from 1967 to the present concerning the meaning of the 1938 Act afford no key to what Congress was thinking in 1962.[13] But since there is no

---

12. Putting aside tendentious industry writings in regard to the 1938 Act, a number of publications issued more or less contemporaneously support plaintiffs' conclusion that § 701(a) was not intended to empower the Secretary to issue binding substantive regulations. Cavers, *supra*, and Kleinfeld, Legislative History of the Federal Food, Drug, and Cosmetic Act, 1 Food Drug, & Cosm.L.J. 532 (1946), set out the legislative history of the Act in detail and establish that the power of the Secretary to issue binding regulations was a controversial aspect of the various bills debated by Congress, see Cavers, *supra*, at 9, 11 n.34; *Kleinfeld, supra*, at 539–42, 546–47, and that these objections were met by providing for elaborate procedures for the promulgation and judicial review of various kinds of legislative regulations, Cavers, *supra*, at 20–21; Kleinfeld, *supra*, at 569, 571–72, 574–76. Professor Fuchs, writing in 1939, characterized regulations issued pursuant to § 701(a) as those "which do not directly control private activity," Fuchs, *supra*, at 44, but we see no basis for this limitation. In his 1940 article,

Lee read § 701(a) as authorizing only interpretive regulations. Lee, *supra*, at 25. Seller and Grundstein, two attorneys in the Department of Agriculture, in their monograph entitled Administrative Procedure and Practice in the Department of Agriculture under the Federal Food, Drug, and Cosmetic Act of 1938 (1940), reprinted in 3 Toulmin, *supra*, § 49.1 at 1146, drew a clear distinction between legislative and interpretive rules and asserted: "As a matter of fact, it was the intention to draft § 701(e) so as to include all rules and regulations of this legislative category." *Id.* at 1154.

13. *Abbott Laboratories* and the *Hyson* quartet, like the instant case, concerned regulations issued to enforce provisions added to the Act by the Drug Amendments of 1962. It could thus be argued that insofar as those cases upheld the power of the Commissioner to issue binding regulations under § 701(a), they accept a Congressional understanding of that provision in

evidence that the 1962 Congress was familiar with the legislative history of the 1938 Act, plaintiffs' argument is really nothing more than an invitation to reconsider the question of the power originally conferred by § 701(a) in 1938. We decline to do so. Even if it were necessary for adjudication of this case to decide what Congress meant in 1938, the evidence mustered by plaintiffs, although persuasive, is not so conclusive as to show beyond doubt that the prior cases misconstrued §· 701(a). See *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 700–01, 98 S.Ct. 2018, 2040–41, 56 L.Ed.2d 611 (1978). Indeed, what the plaintiffs have demonstrated convincingly is that while the 1938 Congress clearly intended § 701(e) regulations to have binding authority, it never decided just what effect § 701(a) regulations would have. A broad construction of a statute, consistent with the words enacted, and maintained for thirteen years by the Supreme Court and this court, need not be rejected simply because of a discovery that sponsors seemingly favored a narrower one more than forty years ago. This is particularly so when the basis for the attitude of the sponsors has disappeared as a result of later enactments, here 5 U.S.C. § 553, and the narrower construction would place the statute apart from other regulatory acts using similar language with respect to rulemaking. Moreover, the FDA, since the decision in *Abbott Laboratories*, has issued a substantial number of binding substantive regulations under § 701(a). *National Nutritional Foods Ass'n v. Weinberger*, 376 F.Supp. 142, 147 n.7 (S.D.N.Y.1974), aff'd 512 F.2d 688 (2 Cir. 1975), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975). A decision at this late date denying such power to it would thus create turmoil throughout numerous areas subject to regulation by the FDA.

It remains to be considered whether, as plaintiffs strongly urge, a different result is required by *Chrysler Corp. v. Brown, supra,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208.

We shall not endeavor to state the case in detail; the part of interest for us is that portion of the opinion, 441 U.S. at 301–08, 99 S.Ct. at 1717–21, holding that disclosure regulations, 41 C.F.R. §§ 60.40–1 to 60.40–4 (1978) issued pursuant to the general grant of rulemaking power to the Secretary of Labor provided in § 201 of Executive Order 11246, did not have the force and effect of law, and thus did not lift the prohibition on certain kinds of disclosures of agency information contained in the Trade Secrets Act, 18 U.S.C. § 1905. Critical to the decision was the fact that the direct authority for the regulation was an executive order and not a statute. "The legislative power of the United States is vested in Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes." 441 U.S. at 302, 99 S.Ct. at 1718. Regulations adopted pursuant to Executive Order 11246 could have the "force and effect of law" only by virtue of "a nexus between the regulations and some delegation of the requisite legislative authority by Congress." 414 U.S. at 304, 99 S.Ct. at 1719. The origins of the Congressional authority for the entirety of Executive Order 11246, setting up a program to end employment discrimination by the Government and its contractors, were "somewhat obscure"; a number of statutes as well as some more general notions of executive power had been relied upon. *Id.* at 304–05, 99 S.Ct. at 1719. The "pertinent inquiry" thus became "whether under any of the arguable *statutory* grants of authority the ... disclosure regulations ... are reasonably within the contemplation of that grant of authority." 441 U.S. at 306, 99 S.Ct. at 1720. The Court had little difficulty in answering this question in the negative. Although this alone would seem dispositive, the Court then addressed itself to the Government's argument that the disclosure regulations were consistent with the

---

1962 at odds with the result desired by the plaintiffs and would preclude our ruling in their favor even if we were otherwise disposed to do so.

goal of combatting employment discrimination and therefore were within the terms of § 201 of the Executive Order, which authorizes rules and regulations "necessary and appropriate" to achieve its purposes. The Court said that "[w]ere a grant of legislative authority as a basis for Executive Order 11246 more clearly identifiable, we might agree with the respondents that this 'compatibility' gives the disclosure regulations the necessary legislative force." However, "the thread between these regulations and any grant of authority by the Congress is so strained that it would do violence to established principles of separation of powers to denominate these particular regulations 'legislative' and to credit them with the 'binding effect of law.'" 441 U.S. at 307–08, 99 S.Ct. at 1720–21.

The Court moved swiftly from this holding to put to rest any argument that the *Chrysler* decision cast doubt on the ability of agencies to make binding substantive regulations where *Congress* had authorized this in general terms. Immediately after the passage just paraphrased it stated:

> This is not to say that any grant of legislative authority to a federal agency must be specific before regulations promulgated pursuant to them can be binding on courts in a manner akin to statutes. What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued.

441 U.S. at 308, 99 S.Ct. at 1721. The Court thought the "best illustration" of this process to be Justice Frankfurter's opinion in *National Broadcasting Co. v. United States, supra,* 319 U.S. 190, cited above as one of

the pre-1962 decisions holding that a general grant of rulemaking authority similar to § 701(a) empowered an agency to issue regulations which "had the force of law and were binding on the courts unless they were arbitrary or not promulgated pursuant to prescribed procedures." 441 U.S. at 308, 99 S.Ct. at 1721.[14]

In these passages of the *Chrysler* opinion we find no indication that the Court meant to overrule the principle that a Congressional delegation of power to make regulations for the efficient enforcement of a statute confers power to make substantive regulations that are binding. That principle was essentially adopted in the *National Broadcasting* case, was established beyond doubt in *American Trucking Ass'ns v. United States,* and was recently reaffirmed in *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973), where the Court declared it "well established" that the validity of a regulation promulgated under a general grant of rulemaking authority will be sustained so long as it is "'reasonably related to the purposes of the enabling legislation'", quoting *Thorpe v. Housing Authority of the City of Durham, supra,* 393 U.S. at 280–81, 89 S.Ct. at 525. Here the legislative history of the Drug Amendments of 1962 demonstrates, if this were needed, that Congress intended its broad language to be fleshed out by regulations issued by the FDA under § 701(a). Not only the terms of the *Chrysler* opinion but also the lack of dissent show that it was not intended to reverse an unbroken series of holdings stretching over more than a quarter of a century.[15]

---

**14.** Plaintiffs can reply that the *Chrysler* Court stressed that in *National Broadcasting,* "the Court probed the language and logic of the Communications Act and its legislative history" and came to its conclusion "only after this careful parsing of authority," 441 U.S. at 308, 99 S.Ct. at 1721, whereas a court engaging in such parsing of the 1938 Food, Drug, and Cosmetic Act shortly after its enactment might well have come to the conclusion that § 701(a) did not confer power to promulgate binding substantive regulations. This simply brings us back to the argument discussed above. That

the statements in *Abbott Laboratories* and in the *Hynson* quartet were made without the benefit of the probing of the language and history of the 1938 Act stressed in *Chrysler* does not detract from their authority as binding precedents.

**15.** One should not overread the *Chrysler* Court's statements that when Congress enacted the statutes alleged to provide authority for Executive Order 11246, it was "not concerned with" disclosure of trade secrets, and that no "delegation of disclosure authority" could be found in those statutes. 441 U.S. at 306, 99

The judgment of the district court is affirmed.

S.Ct. at 1720. It would be taking this language out of context to read it as demanding a level of specificity of congressional intent not heretofore required by the Court's decisions.