**NATIONAL ASSOCIATION OF PHARMACEUTICAL MANUFACTURERS and National Pharmaceutical Alliance, Plaintiffs,**

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, and Food and Drug Administration, Defendants.**

No. 80 Civ. 4205(MEL).

United States District Court, S.D. New York.

May 17, 1984.

Bass, Ullman & Lustigman, New York City, for plaintiffs; Milton A. Bass, Jacob Laufer, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendants; Harvey J. Wolkoff, Asst. U.S. Atty., New York City, Jeffrey B. Springer, Acting Chief Counsel, Michael P. Peskoe, Associate Chief Counsel for Enforcement, Kathleen A. Blackburn, Asst. Chief Counsel for Enforcement, Food and Drug Admin., Dept. of Health and Human Services, Rockville, Md., of counsel.

LASKER, District Judge.

The National Association of Pharmaceutical Manufacturers ("NAPM") is a national trade association consisting of manufacturers and distributors of pharmaceutical products. The National Pharmaceutical Alliance ("NPA") is a not-for-profit corporation organized to promote the interests of

manufacturers and distributors of pharmaceutical and other products throughout the United States. In this action they challenge the legality of regulations promulgated in 1979 by the Food and Drug Administration ("FDA") pursuant to section 501(a)(2)(B) of the Food, Drug & Cosmetic Act, 21 U.S.C. § 351(a)(2)(B) (the "Act"). That statute provides that a drug is "adulterated" within the meaning of the Act if it is not manufactured in conformance with "current good manufacturing practice" ("CGMP"). The regulations prescribe standards for a wide variety of drug manufacturing practices, and violation of the regulations renders a drug product "adulterated" within the meaning of the Act and therefore subject to the Act's enforcement provisions, which include seizures of the offending product and injunctions. In addition, manufacturers of adulterated drugs are subject to possible criminal sanctions.

The instant action challenges the regulations on a wide variety of grounds and seeks a declaratory judgment that the regulations are invalid because they are unconstitutionally vague and are arbitrary, capricious, not otherwise in accordance with law, and unsupported by substantial evidence. The government moves for summary judgment on the ground that all of plaintiffs' claims are barred by principles of *res judicata* as the result of a prior lawsuit between the parties in which the validity of the regulations was challenged. *See National Association of Pharmaceutical Manufacturers v. Food & Drug Administration*, 637 F.2d 877 (2d Cir.1981), *aff'g*, 487 F.Supp. 412 (S.D.N.Y.1980) ("NAPM I"). The Government also contends that, in the event the action is not *res judicata*, it is entitled to summary judgment on the merits because the regulations are not invalid 'on any of the grounds advanced by plaintiffs. Plaintiffs cross-move for sum-

mary judgment on the merits as to eight of the 11 counts of the complaint; they contend that further discovery is necessary before counts IX and X will be ripe for disposition by summary judgment. For the reasons set forth below, we conclude that Counts II, IV, VIII and X are barred by *res judicata*, and that the Government is entitled to summary judgment on the merits on the remaining counts.

I. *The* Res Judicata *Claim*

A.

██ The regulations at issue in this case were promulgated pursuant to the notice and comment procedures of 5 U.S.C. § 553, and became effective March 28, 1979. *See* 43 Fed.Reg. 45013 (1978). On August 23, 1979, the plaintiffs in this action filed a complaint in this court (*NAPM I*) requesting a declaratory judgment that the FDA acted beyond its authority in promulgating the regulations as substantive rather than interpretive regulations.[1] No other challenges to the lawfulness of the regulations were asserted in *NAPM I*. Judge MacMahon dismissed the complaint, and the Court of Appeals, following a detailed review of the legislative history and relevant case law, concluded that the FDA had authority to issue substantive regulations under the CGMP statute, and affirmed the dismissal of the complaint.

The Government argues that the judgment and affirmance in the prior action preclude litigation of this action, citing the principle that

"a final judgment is *res judicata* 'not only to all matters pleaded, but to all that might have been' and 'not only as to all matters litigated and decided by it, but as to all relevant issues which could

---

**1.** Substantive regulations have the force and effect of law, and are subject to judicial review only under the relatively narrow standards set forth in 5 U.S.C. § 706(2). *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Interpretive regulations are merely advisory, and if regula-

tions are interpretive a reviewing court may substitute its own judgment as to what the authorizing statute requires when the validity of agency action is questioned. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

have been but were not raised and litigated in the suit.' "[2]

The Government contends that all of the plaintiffs' challenges to the lawfulness of the regulations could have been asserted in the earlier action, and that prosecution of the instant action is therefore barred.

Plaintiffs respond that *res judicata* bars a subsequent suit between the same parties only when the subsequent suit involves the same cause of action as the first suit.[3] They contend that the present suit asserts a different cause of action from that of *NAPM* I, since *NAPM* I sought only a declaratory judgment as to the legal effect to be accorded the regulations—*i.e.*, their status as substantive or interpretive—while the present action seeks a declaratory judgment that the regulations are invalid on their merits under the standards set forth in 5 U.S.C. § 706(2).

Plaintiffs also argue that there was a strong practical justification for seeking an immediate judicial determination as to whether the rules would be given substantive or interpretive effect, without the delay that might have been occasioned if all possible challenges to the regulations' validity had been asserted in that suit as well. It is argued that if the regulations were held to have been merely interpretive, a manufacturer whose practices did not conform to the regulations could nevertheless avoid penalties in enforcement proceedings if he were able to prove to a court's satisfaction that his methods in fact constituted current good manufacturing practices within the meaning of the statute. If the regulations were substantive, on the other hand, noncompliance would automatically constitute a violation of the law, unless the manufacturer could show that the regulations were invalid because they were arbitrary and capricious or otherwise deficient under the standards of 5 U.S.C. § 706(2).

Under such circumstances, plaintiffs argue, most manufacturers would feel compelled to bring their practices into strict compliance with the regulations, in some cases at great cost, and hence the initial lawsuit was brought to respond to the manufacturers' urgent need for an authoritative determination of the regulations' legal effect. Plaintiffs contend that they should not now be barred from challenging the validity of the regulations on their merits merely because they have already litigated what they contend was a more urgent and entirely distinct legal issue.

### B.

To determine whether *res judicata* bars any or all of the claims asserted in this action, a review of the complaint's allegations is necessary. The complaint is divided into eleven "counts," each of which alleges that for the reasons stated in the count the regulations are unsupported by substantial evidence and are arbitrary, capricious and not otherwise in accordance with the law.

Count I alleges that because the CGMP statute does not apply to so-called "new drugs"—(that is, drugs that have received pre-marketing clearance under the provisions of section 505 of the Food, Drug and Cosmetics Act, 21 U.S.C. § 355), the FDA acted beyond its authority in making the CGMP regulations applicable to all drugs.

Count II of the complaint alleges that because some of the regulations are merely technical in nature and violation of such regulations may not in fact affect the purity or safety of the drug, the FDA acted beyond its authority by providing that any violation of the regulations renders the affected drug adulterated under the Act.[4]

Count III alleges that the regulations are invalid because in promulgating them the

---

**2.** *Teltronics Services, Inc. v. LM Ericsson Telecommunications, Inc.*, 642 F.2d 31, 35 (2d Cir.) cert. denied, 452 U.S. 960, 101 S.Ct. 3108, 60 L.Ed.2d 971 (1981), *citing, In re Interstate Stores,* 558 F.2d 1046, 1047 (2d Cir.1977).

**3.** *See Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 726–27 (2d Cir.1981) ("The principle of res

judicata bars a subsequent suit between the same parties or their privies where a prior action has resulted in a judgment on the merits of the same cause of action").

**4.** 21 C.F.R. § 210.1(b) (1983).

FDA did not limit itself to requiring the use of practices actually prevailing in the industry, but instead adopted requirements that the FDA found to be feasible and valuable in assuring drug quality. Plaintiffs claim that a "feasible and valuable" standard is an incorrect interpretation of "current good manufacturing practice."

Count IV alleges that the regulations are invalid because they are intended to apply to all future drug manufacturing, although current good manufacturing practice, is, according to plaintiffs, necessarily varies over time as standards in the industry change.

Count V alleges that the regulations unlawfully establish non-statutory standards for current good manufacturing practice, in that the standards set forth in the regulations are vague and do not describe in sufficient detail the procedures which manufacturers must follow in order to be in compliance with the regulatory standards.

Count VI repeats the allegations in Count V and adds a claim that the regulations are unconstitutional on grounds of vagueness.

Count VII alleges that in promulgating the regulations, the FDA violated the procedural requirements of 5 U.S.C. § 553, by relying on material that the FDA did not include in the administrative record.

Count VIII alleges that the regulations are unlawful because the binding nature of the regulations permits the FDA to submit the administrative record to the court in an enforcement proceeding in lieu of presenting expert testimony as to what constitutes current good manufacturing practice, and the administrative record supporting the regulations at issue here is inadequate for such a purpose.

Count IX alleges that the regulations are invalid because in promulgating them the FDA relied upon irrelevant factors, including requests from other government agencies for standards which would assist such agencies in their procurement of drug products for federal government needs.

Count X alleges that the FDA's action in promulgating the regulations as substantive rather than interpretive was unlawful because the FDA's decision to do so was made without providing the public with notice and an opportunity to comment.

Count XI alleges that many individual provisions of the regulations are invalid because they are unreasonably burdensome and contrary to current good manufacturing practice.

■■■ In *Herendeen v. Champion International Corp.*,[5] the Second Circuit articulated the standards for barring a lawsuit on grounds of *res judicata* as follows:

> "[I]t is firmly established that a prior judgment must have been rendered by a court of competent jurisdiction, been a final judgment on the merits, and that the same cause of action and the same parties or their privies were involved in both suits.

> \* \* \* \* \* \*

> "The test for determining whether causes of action are the same for purposes of res judicata has been variously expressed. Most frequently cited as the relevant criteria by both this court and the New York courts are whether a different judgment in the second action would impair or destroy rights or interests established by the judgment entered in the first action, whether the same evidence is necessary to maintain the second cause of action as was required in the first, and whether the essential facts and issues in the second were present in the first."

Here, the dispute centers on whether the causes of action asserted in the present complaint should be deemed the same as that asserted in the earlier action, since there is no question that the prior judgment was on the merits and involved the same parties. For purposes of analyzing

**5.** 525 F.2d 130, 133–34 (2d Cir.1975) (footnotes omitted.) *Accord, Tucker v. Arthur Andersen &* *Co.,* 646 F.2d 721, 727 (2d Cir.1981).

this issue, the various counts of the complaint can be divided roughly into two categories: those which challenge the validity of the regulations on grounds related to their substantive status, and those which challenge the regulations on other grounds. Although the Government contends that both categories of claims are barred by *res judicata*, certainly the argument is stronger as to the first category, and we therefore address those claims first.

■ We conclude that four counts of the complaint, Counts II, IV, VIII and X, fall into the first category, and that it is clear that these counts cannot be entertained without re-opening the precise issue decided in *NAPM* I—that is, whether the regulations could lawfully be promulgated as binding, substantive regulations.

The allegations in Count X state that prior to the promulgation of the regulations at issue here the FDA had treated CGMP regulations as interpretive rather than as substantive, and that the FDA's decision to promulgate the new regulations as substantive was "made secretly without public notice"[6] and was therefore unlawful. To grant plaintiffs relief on this claim would clearly "impair or destroy rights or interests" established by the prior judgment, which upheld the FDA's authority to issue the regulations as substantive; moreover, the complaint does not allude to any facts or evidence in support of this claim that were not available in the earlier action.[7] The prior judgment therefore bars the claim alleged in Count X.

The same analysis holds for Counts II, IV, and VIII. Count II alleges that it was unlawful for the FDA to provide that non-compliance with any of the regulations renders a drug adulterated within the meaning of the statute. However, it is a necessary consequence of the binding nature of the regulations that they have the force and effect of law and that a violation of the regulations is a violation of the statutory requirement of abiding by current good manufacturing practice. To the extent that Count II alleges that the regulations should not have been made substantive because some of the regulations are merely "technical" or trivial, the claim is barred by the prior judgment upholding the substantive nature of the regulations. Moreover, if plaintiffs intend to assert in Count II that some of the regulations are invalid on their merits because their requirements are not justified under a "current good manufacturing practice" standard, the claim is merely duplicative of that asserted in Count XI, in which plaintiffs challenge the lawfulness of many specific regulations. Accordingly, to the extent it is not duplicative of Count XI, Count II is barred by the prior judgment.

Count IV is also barred by the prior judgment, because it alleges that the FDA unlawfully "froze" the concept of current good manufacturing practice by issuing binding regulations prescribing what current good manufacturing practice is. Such a claim cannot be entertained without re-opening the issue whether it was proper for the FDA to make the regulations binding.

The same barrier applies to Count VIII, which alleges that the regulations are invalid because the administrative record is inadequate to serve the function that an administrative record must serve when regulations have substantive effect. The allegations of Count VIII center on the fact that when regulations are binding the FDA is not required to prove what constitutes current good manufacturing practice by the laborious process of presenting expert testimony on the issue in each enforcement case. Instead, the regulations establish what CGMP is, and if the validity of the

---

6. Complaint, ¶ 74.

7. On its merits, plaintiffs' claim in Count X is difficult to fathom. The plaintiffs concede, as they must, that the FDA stated its intention to publish the regulations as substantive when the proposed regulations were first published in 1976. *See* 41 Fed.Reg. 6878. The allegations in ¶ 71 of the complaint, that in 1968 the FDA considered CGMP regulations to be interpretive, establish only that there was a policy change, not that the change was secret.

regulations themselves is challenged in the enforcement proceeding, the question for review is simply whether the administrative record adequately supports the promulgation of the regulations.[8] In Count VIII, plaintiffs allege that the regulations should not have been promulgated as binding, and the FDA should not be permitted to forego the necessity of presenting expert testimony in enforcement proceedings, because the administrative record is inadequate. To the extent that this claim seeks to reopen the issue whether the regulations were lawfully made binding, it is barred by the earlier judgment. To the extent, however, that it can be read to assert that the regulations are invalid on their merits because they are not adequately supported by the administrative record, it is simply duplicative of Count XI, which challenges specific regulations on their merits.

### C.

◼ The remaining counts of the complaint do not appear to challenge the substantive nature of the regulations, but assert that the regulations are invalid for other reasons. These counts allege that the FDA is without authority to apply the regulations to so-called "new" drugs (Count I); that the FDA applied an incorrect interpretation of current good manufacturing practice in establishing the regulations (Count III); that the regulations are arbitrary and capricious and violate the Constitution because they are excessively vague (Counts V and VI); that the FDA unlawfully relied on non-record information and irrelevant factors in promulgating the regulations (Counts VII and IX); and that many individual provisions of the regulations are excessively burdensome or contrary to current good manufacturing practice (Count XI).

As previously noted, the factors to be evaluated in determining whether the theories asserted in the present suit are to be deemed the same cause of action asserted in the earlier suit are whether judgment for plaintiffs in this suit would impair rights or interests established by the first judgment, whether the same evidence is necessary in both suits, and whether the facts and issues essential to this suit were present in the first. Applying these factors, we are persuaded that *res judicata* does not bar the remaining claims of the current complaint. The right or interest established in *NAPM* I was the FDA's authority to establish CGMP regulations having the force and effect of law. That authority cannot be affected by a judgment for plaintiffs on the remaining counts of their complaint, which challenge the content and scope of the regulations, not their legal effect.

Moreover, as to one of the remaining counts, Count XI, the evidence necessary to a decision includes the administrative record, a review of which was not necessary to the decision in *NAPM* I. As to the other counts, although the "facts" and "evidence" are in some sense the same as in *NAPM* I—because the consistency of the regulations with applicable legal standards is the sole issue—the inquiry necessary to determine the merits of plaintiffs' current claims is nevertheless quite different. The earlier suit required only an analysis of whether the legislative histories of 5 U.S.C. § 701(a) and of the CGMP statute, and the relevant case law, supported the FDA's authority to promulgate binding CGMP regulations. The instant suit necessitates an analysis, for example, of whether the specific regulations established by the FDA are excessively vague; whether, in promulgating them, the FDA relied on improper factors or legal standards; and, in the case of Count I, the relationship between the CGMP statute and the statute governing "new" drugs.[9]

---

8. *See NAPM I, supra,* 637 F.2d at 878 n. 2; 43 Fed.Reg. 45013, 45035 (1978).

9. The Government argues that Count I challenges the FDA's authority to issue binding CGMP regulations which are applicable to new drugs, and therefore is a challenge to the binding nature of the regulations. This does not appear to be a proper construction of the complaint, however. Count I does not mention the binding nature of the regulations, but appears instead to challenge the FDA's authority to in-

The Government places heavy reliance on *Teltronics Services, Inc. v. LM Ericsson Telecommunications, Inc.*,[10] which emphasizes the necessity of precluding repetitive litigation "based upon the same conduct alleged in the first complaint."[11] However, the circumstances in *Teltronics,* in which the plaintiff alleged identical antitrust claims against one of its suppliers in two separate actions, cannot reasonably be analogized to the situation here, where the lawsuits involve separate legal issues, albeit pertaining to the same regulations. While we have agreed with the Government that the plaintiffs should not be permitted to advance in this suit new arguments as to why the FDA should not have promulgated substantive regulations, we believe that the plaintiffs were not obligated to advance all other theories as to the regulations' invalidity as well.[12] Such a ruling does not mean, as the Government argues, that plaintiffs are necessarily free to assert further legal challenges to the regulations in separate lawsuits. Rather, it recognizes that in view of plaintiffs' legitimate need for a prompt determination of the legal effect of the regulations in the earlier action,[13] and the significant difference between the claim asserted in the earlier action and the claims advanced in the remaining counts of the current complaint, preclusion of the present claims is not warranted under principles of *res judicata.*

## II. *Applicability of CGMP Regulations to New Drugs*

Count I of the complaint alleges that the FDA had no authority to require that drugs approved for marketing under Section 505(b) of the Act, 21 U.S.C. § 355(b),— so-called "new drugs"—must also comply with CGMP regulations. Plaintiffs contend that because, under the new-drug provisions, the FDA approves the manufacturing methods used in producing any new drug before permitting the drug to be marketed, and because the new-drug provisions of the Act contain their own enforcement mechanisms by which such approval can be withdrawn if the manufacturing methods are later found to be inadequate, Congress could not have intended that new drugs would also be subject to regulation under the CGMP statute.

To address plaintiffs' contentions, consideration of the relevant statutory schemes is necessary.[14] Provisions regarding adulter-

clude drugs approved under § 505 of the Act (new drugs) within the ambit of any regulations promulgated under the CGMP statute. See Complaint ¶¶ 22–27.

**10.** 642 F.2d 31 (2d Cir.), *cert. denied,* 452 U.S. 960, 101 S.Ct. 3108, 60 L.Ed.2d 971 (1981).

**11.** *Id.* at 36.

**12.** In our view, this conclusion is not affected by the fact that, during the first action, plaintiffs informed the court that they intended to amend their complaint to assert some of their present claims, but failed to do so. The Government does not contend that it suffered any prejudice as a result, for example by responding to plaintiffs' proposed amendments at the time and being forced to present the same arguments here. Under such circumstances, we do not perceive any significant practical difference to the Government between being forced to respond to new arguments in an amended complaint, or being forced to respond to such arguments in a new complaint filed shortly thereafter.

**13.** In publishing the Final Rule establishing the CGMP regulations, the FDA itself recognized

that the question of the legal effect of the regulations was of special significance to manufacturers, and suggested that interested parties pursue prompt judicial review of the issue:

"As noted at the outset of this discussion, the Commissioner does not intend in the future to reconsider the legal authority of FDA to promulgate binding CGMP regulations.... The Commissioner advises any person who still questions FDA's authority to do this is welcome [sic] to seek prompt pre-enforcement judicial review of this authority."
43 Fed.Reg. 45013, at 45025 (1978).

**14.** Although the complaint alleges at one point that the application of CGMP regulations to new drugs is unlawful because it is "unsupported by substantial evidence and is arbitrary, capricious and contrary to law," the thrust of plaintiffs' contentions is that the FDA's action is in excess of statutory authority. *See* 5 U.S.C. § 706(2)(C) (court may set aside agency action "in excess of statutory jurisdiction, authority or limitations, or short of statutory right"). Such a claim "necessarily entails a firsthand judicial comparison of the claimed excessive action with the pertinent statutory authority." *Western Union*

ation of drugs were first enacted in the Food and Drugs Act of 1906.[15] These provisions were succeeded by section 501 of the Food, Drug and Cosmetic Act of 1938 [16] which strengthened and expanded federal prohibitions against adulterated drugs. The 1938 Act, however, contained no provisions regarding "current good manufacturing practice." The CGMP requirement was added to section 501 of the Act by the Drug Amendments Act of 1962.[17] Section 501 now reads, in part (with the CGMP provisions underlined):

> "A drug or device shall be deemed to be adulterated—
>
> (a)(1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; or (2)(A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or (B) *if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not confirm to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this Act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."*

The sanctions available to the FDA to prevent the productions distribution and/or sale of adulterated drugs include *in rem* seizures, temporary restraining orders, and injunctions.[18] Such sanctions permit the FDA to remove specific lots of adulterated drugs from the market, as well as to enjoin future production of drugs whose manufac-

ture does not comply with the requirements of current good manufacturing practice.

The new-drug provisions of the Act govern the procedures that must be followed when a manufacturer wishes to market a drug whose safety and effectiveness is not yet a matter of general recognition among scientific authorities. Section 201 of the Act, 21 U.S.C. § 321(p), defines a "new drug" as

> "Any drug ... the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labelling thereof...."

Like the CGMP provision, the current provisions governing approval of new drugs were added to the Act by the Drug Amendments Act of 1962. The new-drug provisions set forth an application procedure requiring a drug manufacturer to submit evidence to the FDA showing that a new drug is safe and effective in order to obtain approval of the drug for marketing in interstate commerce. The application must include a description of the methods used in manufacturing the drug, and these methods must meet with the FDA's approval before the drug can be marketed. *See* Section 505(b) of the Act, as amended, 21 U.S.C. § 355(b).

Section 505 of the Act also establishes procedures for revoking a new-drug approval. Generally, the FDA must provide notice to the manufacturer and an opportunity for a full evidentiary hearing before the agency. The approval may be summarily suspended, however, if the FDA finds that continued sale of the drug would be "an imminent hazard to the public

---

*Telegraph Co. v. Federal Communications Commission,* 541 F.2d 346, 354 (3d Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977).

**15.** Ch. 3915, 34 Stat. 768 (1906).

**16.** Ch. 675, 52 Stat. 1049 (1938) (codified as amended at 21 U.S.C. § 351).

**17.** Pub.L. No. 87–781, Title I, § 101, 76 Stat. 780 (1962).

**18.** *See* 21 U.S.C. §§ 332, 334.

health." [19] In such cases, the offending products are subject to seizure and removal from the market-place.[20]

Plaintiffs contend that Congress could not have intended to give the FDA authority to apply sanctions for the violation of CGMP regulations to drugs whose manufacturing methods had already been approved by the FDA under new-drug licensing procedures. According to plaintiffs, Congress enacted the CGMP provision only to give the FDA authority with respect to "old" drugs whose manufacturing methods would otherwise be unregulated because they can be marketed without advance FDA approval. The Government responds that the plain language of the CGMP statute, the different functions of the adulteration and new-drug provisions, the history of the enforcement of the CGMP statute, and the relevant case law all support the conclusion that new drugs are not exempt from compliance with CGMP regulations.

■ We find the Government's arguments on this question persuasive. Because the CGMP statute by its terms does not provide for an exemption for new drugs, such an exemption should be read into the statute only if it is necessary "to prevent absurd results or consequences obviously at variance with the policy of the enactment as a whole." [21] In light of the different functions of the CGMP and new-drug provisions, the application of CGMP requirements to new drugs would not lead to absurd results. As the Government points out, approval and revocation of a new-drug application under the new-drug provisions is an all-or-nothing proposition; either the drug as described in the application can be marketed, or it cannot. The FDA's authority under the adulteration section of the Act, which includes the CGMP provision, is not so limited; for example, the FDA can confine its enforcement proceedings to a specific lot of a drug if it believes that that lot was produced in violation of the CGMP regulations. If the CGMP regulations were inapplicable to new drugs, the FDA would not be able to take enforcement action with respect to a specific lot of new drugs, but would have to choose between initiating lengthy procedures to revoke the manufacturer's approval for marketing the drug at all, or taking no enforcement action. Since the new-drug provisions are concerned primarily with the licensibility of a drug as described in the application, while the adulteration provisions are concerned primarily with the actual conditions and methods by which a drug is being produced at a given time, the CGMP provisions are by no means strictly duplicative as applied to new drugs.

Moreover, the legislative history of the CGMP statute offers little support for plaintiffs' position. The CGMP statute was added to the Act by the same bill which established the current procedures for the approval of new drugs. Hence, it is reasonable to assume that if Congress had intended to exempt new drugs from the CGMP requirements, such an exemption would have been expressly provided in the statute. Furthermore, the Senate, House, and Conference reports accompanying the enactment of the Drug Amendments Act of 1962 do not reflect an intent to exclude new drugs from the CGMP provisions; in describing the scope of the CGMP requirement the reports refer to "a drug" or "any drug," without qualification.[22]

**19.** *See* 21 U.S.C. § 355(e).

**20.** *See* 21 U.S.C. § 334(a)(1).

**21.** *United States v. Rutherford,* 442 U.S. 544, 549, 99 S.Ct. 2470, 2473, 61 L.Ed.2d 68 (1979).

**22.** The Senate report states, for example: "By an amendment of section 501(a)(2) of the Food, Drug and Cosmetic Act, a drug may be deemed to be 'adulterated' if such methods, facilities or controls were found not to conform to current good manufacturing practice to assure safety, identity, strength, quality and purity of the product. By placing this definition in the 'adulteration' section of the act, the bill would enable the Food and Drug Administration to make multiple seizures of any drug even though there is no deficiency in the product itself." S.Rep. No. 1744, 87th Cong., 2d Sess. 9 (1962), *reprinted in* 1962 U.S.Code Cong. & Admin. News, pp. 2884, 2890.

Plaintiffs rely chiefly on two items in the legislative history, neither of which provides significant support for their position. The first is a statement in the Senate Report, which reads: "[t]he Committee believes that under present procedures the Food and Drug Administration has ample authority, as indicated in practice, to keep unsafe new drugs off the market." [23] Plaintiffs cite this statement as evidence that the CGMP requirement was intended to apply only to "old" drugs. The statement has been taken out of context, however: it does not appear in the Report's discussion of the new CGMP requirement, but rather in the section of the Report which discusses the proposed amendments to the new-drug provisions which, as noted previously, were also part of the Drug Amendments Act of 1962. The thrust of the discussion in which the statement appears is that despite the FDA's substantive authority to keep unsafe new drugs off the market, the Senate Committee believed that deficiencies existed in the procedures governing approval of new drugs, and that amendments to those procedures were therefore warranted. Hence, the statement cannot reasonably be given the construction for which plaintiffs argue.

Plaintiffs also rely on a statement made by Representative Schenck during floor debate on the CGMP bill in the House. Representative Schenck stated:

"The principal purpose of the provision is to assure that the same high manufacturing standards are followed in making so-called old drugs that the law now requires in the making of so-called new drugs. Before any manufacturer is permitted to make a new drug he must file complete details of his manufacturing process with the Food and Drug Administration. It is not intended that the regulations issued under section 101 [the CGMP regulations] will apply to the manufacturer of new drugs insofar as concerns the methods, facilities, or controls used in making these new drugs but that the Food and Drug Administration will require that such drugs meet the requirement of this act as to safety, and has the identity and meets the quality and purity characteristics which it purports or is represented to possess." [24]

Even if the meaning of Representative Schenck's statement were clear, the statement of one Congressman during floor debate would not ordinarily be a sufficient basis for adopting a construction of the CGMP statute which is at variance with its plain wording and is not clearly reflected in the House or Senate reports.[25] In any event, Representative Schenck's statement is confusing at best. Although he does state that the CGMP regulations do not apply to new drugs "insofar as the methods, facilities or controls used" in making such drugs, he adds that the FDA "will require such drugs to meet the requirement of this act" as to safety, identity, quality and purity. Since both sets of requirements are part of the CGMP statute, Representative Schenck's statement stands at most for the proposition that one aspect of the statute applies to new drugs, and another does not. Plaintiffs do not acknowledge this, but insist that the statement fully supports the conclusion that the CGMP requirement is inapplicable to new drugs. The statement is too slender a reed to support plaintiffs' construction of the statute.

Finally, the FDA's construction of the statute is bolstered by the relevant case law. Although no court of which we are aware has carried out a considered analysis of the applicability of the CGMP requirement to new drugs, at least one case appears to have summarily dismissed the argument that the requirement is inapplicable to such drugs. In *United States v. Dianovin Pharmaceuticals, Inc.*,[26] the

**23.** *Id.*

**24.** 108 Cong.Rec. 21057 (1962).

**25.** *See Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969).

**26.** 475 F.2d 100 (1st Cir), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 65 (1973).

752

First Circuit affirmed the district court's findings that the defendant drug manufacturer had violated the Act's provisions regarding adulteration (including the requirement of current good manufacturing practice) and misbranding. In its opinion the Court referred to "[a]ppellants' 'new drug' argument" and summarily rejected it, stating "[a]ll drugs whether old or new are subject to the prohibition against adulteration or misbranding."[27] Other courts, without ruling on the issue whether the CGMP requirement applies to new drugs, have found particular drugs to be in violation both of the CGMP and new-drug regulations.[28] In sum, the available case law, though far from conclusive, offers modest support for the Government's position, and none for plaintiffs' interpretation of the CGMP statute.

We conclude that the Government is entitled to summary judgment dismissing Count I of the complaint.

### III. Alleged Reliance on Improper Standard

Count III of the complaint alleges that the FDA based its regulations upon a standard unrelated to the statutory standard of "current good manufacturing practice." It is argued that CGMP regulations must reflect "actually prevailing manufacturing practice in the drug industry,"[29] and that the requirements adopted by the FDA, instead of being based on prevailing industry practices, are merely those which it deemed "feasible and valuable" in assuring drug quality. Plaintiffs contend that the adoption of a "feasible and valuable" standard for CGMP regulations renders the regulations invalid.

Plaintiffs' claim is predicated upon the following passage in the preamble to the regulations, in which the Commissioner rejected the argument that CGMP regulations must be based upon already-prevailing industry standards:

"Although the practices must be 'current' in the industry, they need not be widely prevalent. Congress did not require that a majority or any other percentage of manufacturers already be following the proposed mandated practices, as long as it was a current good manufacturing practice in the industry, i.e., that it had been shown to be both feasible and valuable in assuring drug quality."[30]

■ The Government contends that the Commissioner's position as expressed in the passage cited by plaintiffs is correct, and that "feasible and valuable" is synonymous with, or at least consistent with, "current and good." We agree. To accept plaintiffs' contention that CGMP regulations must reflect "actually prevailing manufacturing practice in the drug industry" would leave the establishment of CGMP requirements in the hands of the manufacturers and would tend to freeze the development of better practices over time. In the passage cited by plaintiffs the Commissioner acknowledges that the regulations must be based on 'current' practices; his further statement that such practices need not already be accepted by a majority of manufacturers expresses a common-sense interpretation of the statute, which requires that practices be "good" as well as "current." The plaintiffs' contention that the FDA, by requiring practices which are feasible and valuable in assuring drug quality, employed a standard which is "unrelated" to the statutory requirement of current good manufacturing practice, is sophistic and unmeritorious.

■ Plaintiffs also argue that the FDA departed from statutory standards by failing to formulate different CGMP regulations for different sub-groups of manufac-

27. 475 F.2d at 103.

28. See United States v. Western Serum Co. Inc., 498 F.Supp. 863 (D.Ariz.1980) (animal drugs); United States v. Articles of Drug Labeled Colchicine, 442 F.Supp. 1236 (S.D.N.Y.1978), aff'd mem. sub nom. United States v. Consolidated Midland Corp., 603 F.2d 215 (2d Cir.1979).

29. Complaint, ¶ 38.

30. 43 Fed.Reg. 45013, 45018 (1978).

turers within the drug industry. Although plaintiffs present this claim in the section of their memorandum which discusses Count III of the complaint,[31] Count III itself makes no reference to the question of industry sub-groups. In any event, putting aside the question whether plaintiffs' contention as to industry sub-groups is properly before the Court, it is without merit. Plaintiffs rely merely on their own *ipse dixit* to support the argument that the statute calls upon the FDA to formulate separate CGMP regulations for different industry sub-groups. The statute mentions no such requirement. Moreover, as the Government points out, plaintiffs have not even attempted to identify the "subgroups" into which they believe the drug manufacturing industry should be subdivided, nor have they explained how any given regulation is inappropriate for any particular industry sub-group.

The Government is entitled to summary judgment as to Count III of the complaint.

## IV. *Alleged Vagueness of Regulations*

Counts V and VI of the complaint assert related challenges based upon the alleged vagueness of the regulations. Count V alleges that the regulations establish vague requirements by specifying "what is to be accomplished" without specifying "how to" accomplish it, and that as a result the regulations are not authorized by the CGMP statute and are arbitrary, capricious and not in accordance with law.[32] Count VI alleges that the regulations are unconstitutional as well as arbitrary and capricious on grounds of vagueness.

The primary basis of plaintiffs' allegations of vagueness is the regulations' use of words such as "adequate," "appropriate," "designed to assure," "proper," "sufficient," and "suitable" in many of the provisions. As an example plaintiffs quote a

provision of Subpart E of the regulations, which deals with "Control of Components and Drug Product Containers and Closures":

> "(a) There shall be written procedures describing in sufficient detail the receipt, identification, storage, handling, sampling, testing, and approval or rejection of components and drug product containers and closures; such written procedures shall be followed." [33]

Plaintiffs contend that this regulation, and others phrased in similar terms, are excessively vague because they do not specify what constitutes "sufficient detail." They argue that such regulations give the FDA unfettered authority to prosecute drug manufacturers, since the FDA could deem any amount of detail insufficient if it wished to.

The Government argues that the regulations are as detailed as is practical in view of the large variety of drug products and manufacturing operations to which they apply. The Government contends that words such as "sufficient," "adequate," and the like are used in order to provide some flexibility to manufacturers in complying with the regulations. Indeed, the Government points out, plaintiffs themselves urged the FDA to use phrases such as "if necessary," "appropriate criteria," "appropriate sampling technique," and the like, during the notice and comment period prior to issuance of the final regulations.[34]

Violation of the CGMP regulations may result in the imposition of criminal sanctions, and the regulations therefore "must be sufficiently definite to give notice of the required conduct to one who would avoid [their] penalties, and to guide the judge in [their] application and the lawyer in defending one charged with [their] viola-

---

31. *See* Plaintiff's [sic] Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Memorandum") pp. 39–43.

32. Complaint, ¶¶ 49–51.

33. 21 C.F.R. § 211.80(a) (1983).

34. *See* Administrative Record, Comments of NAP and NAPM, pp. 1253–55, 2360, 2365, 2367, 2369.

tion." [35] We believe the regulations at issue here meet this requirement. Fortunately, in deciding this question we do not write upon an entirely bare slate. The CGMP statute itself was upheld against a vagueness attack in *United States v. Bel-Mar Laboratories, Inc.*, 284 F.Supp. 875 (E.D.N.Y.1968), in a thorough opinion by Judge Mishler which has been relied upon by other courts in rejecting vagueness challenges to the CGMP statute.[36] Although the phrase "current good manufacturing practice" is itself susceptible of a broad range of interpretations, Judge Mishler in sustaining its constitutionality noted that:

> "[t]he requisite conditions are not demanded in the abstract, but rather are expressly related to the achievement of a specified goal—the assurance that drugs will be safe and reliable." [37]

The same is true of the regulations at issue here. Such words as "adequate," "sufficient," and "proper" are conjoined with specific goals relating to the safety and purity of drugs; for example, the requirement quoted above of written procedures in "sufficient detail" is part of the requirement that manufacturers maintain controls over drug components and containers. If the broad statutory requirement of "current good manufacturing practice" is not excessively vague, certainly the instant regulations, which refine and interpret that requirement, are not unlawful.

Moreover, the possibility of agency abuse of the discretion afforded to it by a broadly-worded statute was considered in *United States v. Sullivan*, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948), which rejected a vagueness challenge to section 301(k) [38] of the Act, which forbids the misbranding of drugs held for sale after ship-

ment in interstate commerce. The Court discounted the spectre of "extreme possible applications" of the statute, stating:

> "There will be opportunity enough to consider such contingencies should they ever arise. It may now be noted, however, that the Administrator of the Act is given rather broad discretion—broad enough undoubtedly to enable him to perform his duties fairly without wasting his efforts on which may be no more than technical infractions of law." [39]

In sum, the regulations are sufficiently definite and precise to comport with constitutional standards and are not arbitrary or capricious on grounds of vagueness. The Government is therefore entitled to summary judgment dismissing the complaint as to Counts V and VI.

## V. *Adequacy of Administrative Record*

Count VII of the complaint alleges that the FDA precluded meaningful public comment on the proposed regulations, and frustrated effective judicial review of the regulations, by failing to include in the administrative record all of the information upon which the regulations were developed. It is contended that, because the FDA announced it was relying in part on its expertise as developed through thousands of inspections and enforcement proceedings over the years, it should have placed in the administrative record the reports documenting those inspections. The Government argues that the documents in question consist of tens of thousands of reports which were far too cumbersome to place in the administrative record, that the FDA is not required to provide detailed proof of its expertise in an informal rule-

---

**35.** *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952).

**36.** *See United States v. Article of Drug ... White Quadrisect,* 484 F.2d 748 (7th Cir.1973) (per curiam); *United States v. Kendall Co.,* 324 F.Supp. 628 (D.Mass.1971). *See also United States v. Articles of Drug Labeled Colchicine, supra,* 442 F.Supp. at 1241.

**37.** *United States v. Bel-Mar, supra,* 284 F.Supp. at 882–83.

**38.** 21 U.S.C. § 331(k).

**39.** *United States v. Sullivan,* 332 U.S. at 694, 68 S.Ct. at 334, *quoted in, United States v. Bel-Mar, supra,* 284 F.Supp. at 882. Section 306 of the Act, 21 U.S.C. § 336, gives the Secretary authority to issue a warning rather than initiate a prosecution as to minor violations of the Act.

making proceeding, and that the administrative record which was compiled was more than adequate to provide a meaningful opportunity for public comment and judicial review.

■ Although regulations promulgated under the "notice and comment" procedure set forth in 5 U.S.C. § 553(c) need not be accompanied by detailed findings of the kind required in formal rulemaking, and are reviewable only under the deferential "arbitrary, capricious" standard of review, that fact "does not lessen or excuse the agency's obligation to publish a statement of reasons that will be sufficiently detailed to permit judicial review ... and even under the 'arbitrary, capricious' standard agency action will not be upheld where inadequacy of explanation frustrates review." [40] However, although the agency must explain the basis for its actions, "[w]hat will constitute an adequate record for meaningful review may vary with the nature of the administrative action to be reviewed." [41] Regulations based on technical scientific data, for example, require a more detailed explanation of the agency's conclusions than less technical regulations.[42]

The regulations at issue here are not technical in nature. They do not prescribe scientific specifications to be followed in the manufacture of particular drugs, but instead establish general standards, e.g., for the use of written procedures in various aspects of the manufacturing process, maintenance of adequate lighting and ventilation in buildings used for manufacturing operations, use of testing and sampling procedures, sanitation, recordkeeping, and the like. The administrative record supporting the regulations comprises 12 volumes and four appendices, including the proposed regulations and preamble (which explains many of the new or revised CGMP regulations); summaries of the FDA's compliance activities from 1975–1977; over 2,000 pages of public comments received on the proposed regulations;[43] and a 306 page preamble to the final regulations discussing and responding to the comments received by the agency.

The materials which plaintiffs claim should have been included in the administrative record are the documents generated in the course of the FDA's compliance and enforcement activities, activities which form part of the basis of the FDA's expertise with respect to current good manufacturing practices. In the preamble to the final regulations, the Commissioner explained that the materials evidencing this expertise— e.g., inspection reports and new drug applications—are, for the most part, readily available to the public, and are "so voluminous that formal inclusion into the administrative record of this proceeding is not practical." [44] As summarized by the Commissioner, these materials consist of:

—20,000 inspection reports as to establishments manufacturing drugs for human use, and 6000 inspection reports as to veterinary drug establishments;

—1000 full new drug applications, 1500 abbreviated new drug applications, and 6,900 new animal drug applications, along with 10,000 supplements to approved applications;

—establishment inspection reports to 1200 recalls of human drugs and 275 recalls of veterinary drugs;

—documents relating to over 500 enforcement proceedings involving human and veterinary drugs;

—reports and publications reflecting FDA participation in meetings, seminars

40. *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975).

41. *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 249 (2d Cir.1977).

42. *See generally United States v. Nova Scotia Food Products Corp., supra.*

43. The Commissioner provided a 120-day period for comment on the proposed regulations, double the statutorily required 60-day period. *See* 41 Fed.Reg. 6878 (1976).

44. 43 Fed.Reg. 45013, 45018 (1978).

and workshops with industry and educational groups.

 We agree with the Government that the exclusion of these documents from the administrative record did not preclude meaningful public comment on or judicial review of the regulations (as witnessed by, *inter alia,* the 2000 pages of public comments received, and this very lawsuit). In view of the general, non-technical nature of the regulations, it is difficult to perceive how inclusion of thousands of reports on individual inspections would have significantly furthered public comment on the regulations. In any event, the administrative record does include descriptive summaries of the FDA's enforcement activities, and most of the actual documents were available for public inspection either in the FDA's files or through Freedom of Information Act requests.[45] Moreover, the inclusion of these documents in the administrative record is not necessary to permit effective judicial review of the regulations. In a 306-page preamble to the final regulations, the Commissioner carefully reviewed the comments received and explained his basis for adopting the final version of the regulations.[46] Many of the regulations were modified in accordance with criticisms or suggestions received during the comment period; where suggested revisions were not adopted, the Commissioner generally explained why. The Commissioner's discussion provides a "thorough and comprehensible statement of the reasons for [the FDA's] decision,"[47] and a reviewing court, by examining the comments received and the Commissioner's response, has an ample basis for determining whether or not the regulations are arbitrary and capricious. Inclusion of the raw documents reflecting the FDA's day-to-day enforcement and compliance activities would have added little further illumination to a reviewing court. Accordingly, the Government is entitled to summary judgment dismissing Count VII of the complaint.

## VI. *Alleged Consideration of Impermissible Factors*

 Count IX of the complaint alleges that the regulations are unlawful because the Commissioner, in deciding whether to issue revised regulations, took into account the FDA's "responsibility for quality assurance of all drugs ... procured, stored and distributed" by government agencies such as the Veterans Administration and the Department of Defense.[48] Plaintiffs contend that the needs of governmental agencies are factors unrelated to the CGMP statute and that consideration of such matters renders the regulations invalid. The Government answers that (1) the CGMP regulations are to be judged against their authorizing statute, and if they are consistent with the statute (as the government asserts that they are) the consideration of other agencies' needs is irrelevant, and (2) there is no basis in the record to infer that the needs of other agencies played a role in framing the substantive content of the regulations.

In his preamble to the proposed regulations, which were first published on February 13, 1976, the Commissioner announced that the regulations were being substantially revised for the first time since 1971 in order "to update them in light of current technology and to adopt more specific requirements better to assure the quality of finished drug products."[49] The Commissioner also described the results of two government studies which had identified duplication and inefficiency in drug pro-

---

45. The public availability of information not included in the administrative record is a factor to be considered in determining whether the record is inadequate for failing to include it. See *United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519, 534–35 (D.C.Cir. 1978); *Air Products & Chemicals, Inc. v. Federal Energy Regulatory Commission,* 650 F.2d 687, 697 (5th Cir.1981).

46. The final regulations and preamble appear at A. 2436 and in 43 Fed.Reg. 45013 (1978).

47. *National Nutritional Foods Ass'n v. Weinberger, supra,* 512 F.2d at 701.

48. 41 Fed.Reg. 6878 (1976).

49. *Id.*

curement and quality assurance programs conducted by various government agencies.[50] The studies recommended, *inter alia*, that the FDA take over quality assurance functions for government agencies which at that time were each performing separate inspection and testing programs as to drugs they purchased. The Commissioner noted that, in response to the reports, agreements had been reached with various agencies as to FDA's responsibility for quality assurance programs for drugs procured by the agencies. The Commissioner stated that

"In reviewing the need for revised CGMP regulations at this time, the Commissioner took into consideration the requirements of these Federal purchasing agencies to be certain that uniform and appropriate criteria are being proposed."[51]

The preamble's comments as to this matter were confined to such general remarks.

We find persuasive the Government's contention that unless the regulations are inconsistent or in conflict with the statutory standard of current good manufacturing practice, the FDA's consideration of the requirements of other agencies is of little relevance. Plaintiffs virtually concede as much in their memorandum of law, by arguing that "the procurement needs of federal agencies are not a factor which may be considered *to the extent that they may exceed 'good manufacturing practice' under the statutory definition.*"[52]

Despite their vigorous criticism of the Commissioner's reference to the needs of other agencies, plaintiffs identify only three matters as to which they claim that the needs of other agencies resulted in the promulgation of regulations not justified

by the CGMP statute. The first two have already been discussed in Section III, *supra:* the FDA's establishment of requirements which are "feasible and valuable in assuring drug quality"[53] instead of requirements confined to practices already prevalent in the industry; and the FDA's failure to establish different sets of regulations for different industry subgroups. As stated earlier, nothing in the statute requires that CGMP regulations be limited to practices already accepted by a majority of manufacturers, nor that different regulations be established for different subgroups of the industry. Accordingly, these arguments provide no support for plaintiffs' contention that the needs of other agencies resulted in the adoption of requirements unrelated to the CGMP statute.

The only other regulation cited by plaintiffs[54] as having been adopted to satisfy the needs of other agencies rather than the requirement of current good manufacturing practice is section 211.22(c), which provides:

"The quality control unit shall have the responsibility for approving or rejecting all procedures or specifications impacting on the identity, strength, quality, and purity of the drug product."

The "quality control unit" is the group or individual within a drug manufacturing operation which is responsible for quality control.[55] Plaintiffs contend that section 211.22(c) requires the quality control unit to make ultimate decisions which are properly the function of management or of personnel with specific expertise in a given area— for example, decisions as to engineering specifications. They contend that section 211.22(c) seeks to make the quality control

---

**50.** "How to Improve the Procurement and Supply of Drugs in the Federal Government," report issued by the General Accounting Office ("GAO"), December 6, 1973, A. 380; "Study of an Optimum Procurement and Distribution System for Medical and Non-perishable Subsistence Items," report issued by the Office of Budget and Management ("OMB"), January 4, 1974, A. 440.

**51.** 41 Fed.Reg. 6878 (February 13, 1976).

**52.** Plaintiffs' Memorandum, *supra* note 31, p. 69 (emphasis added).

**53.** 43 Fed.Reg. 45013, 45018 (1978).

**54.** Plaintiffs' Memorandum, *supra* note 31, p. 85.

**55.** 43 Fed.Reg. 45013, 45032, 45033–34 (¶¶ 78, 93) (1978).

unit accountable for all problems in the manufacturing process as a means of furthering the FDA's administrative convenience and of assisting federal agencies in their procurement of drugs.[56]

Plaintiffs do not explain why they believe this regulation is of particular benefit to federal agencies which must procure drugs. In any event, in the preamble to the final regulations, the Commissioner explained that section 211.22(c) was not intended to require the quality control unit to usurp the functions of other departments or personnel:

> "The Commissioner realizes that not all expertise rests with the quality control unit, and he does not believe that the quality control unit should be solely responsible for developing and implementing all procedures and specifications impacting on drug product quality. A manufacturer may assign primary and initial responsibility for selecting procedures or specifications to the persons or units it believes most qualified. The Commissioner's intent is that the quality control unit be responsible for making sure that the procedures and specifications developed are appropriate and followed." [57]

Thus, plaintiffs' primary criticism of the regulation is wide of the mark, since the Commissioner's own interpretation of the regulation establishes that it is not intended to have the consequences feared by plaintiffs. Moreover, the administrative record contains ample evidence that requiring quality control personnel to be accountable for such matters is a current good manufacturing practice helpful in assuring drug quality;[58] indeed, some comments submitted to the FDA criticized the regulations for not placing greater responsibility with the quality control unit.[59] Thus, even assuming the FDA considered the needs of

other agencies in establishing this specific requirement—an assertion based purely on plaintiffs' speculation—it would not follow that the regulation is invalid, since it is clearly an example of current good manufacturing practice which the FDA was authorized to establish.

Although the above analysis alone warrants granting summary judgment as to Count IX, it is worth further note that the record fails to support plaintiffs' contention that the needs of other agencies played any role in the drafting of particular regulations. In accordance with the recommendations of the two government reports described earlier, the FDA entered into agreements with other agencies by which the FDA assumed responsibility for drug quality assurance operations that had previously been carried out independently by the other agencies. The agreements with these agencies—the Health Services Administration ("HSA") the Veterans' Administration, ("VA") and the Department of Defense ("DOD") were published in the Federal Register.[60] The primary subject of the agreements is the FDA's assumption of responsibility for testing of drugs and inspection of manufacturing establishments which do business with the agencies. The agreements also state that the CGMP regulations will be the manufacturing standards applied to drugs procured by the agencies, that the FDA will be responsible for enforcing the regulations, and that the FDA will continue to revise and update the CGMP regulations "in a timely manner." [61]

The agreements do not give the agencies in question a role in drafting CGMP regulations, save for the opportunity to comment on proposed regulations as any member of the public may do. The agreements' reference to revisions in the CGMP regulations

---

56. Plaintiffs' Memorandum, *supra* note 31, p. 85.

57. 43 Fed.Reg. 45013, 45034–35 (¶ 102) (1978).

58. *See* Memorandum from Paul J. Sage, Consumer Safety Officer, Food and Drug Administration, Exhibits 1 and 2, A. 611–638, A. 639–644.

59. *Id.*, A. 596–607.

60. *See* 40 Fed.Reg. 28656 (1975) (HSA); 40 Fed. Reg. 36787 (1975) (VA); 41 Fed.Reg. 3887 (1976) (DOD).

61. *See, e.g.*, 40 Fed.Reg. 28656, 28657, ¶ V. 1. (1975) (HSA agreement).

appears to indicate simply that the other agencies wished to be sure that the regulations would be updated if they were to be adopted as the standards applicable to the drugs procured by the agencies.[62]

In sum, the record as it stands does not reflect a genuine issue of material fact as to the influence of other agencies in the drafting of specific regulations promulgated by the Commissioner, and we find convincing the Government's contention that in the absence of such a showing in the current record, the allegations of the complaint alone do not provide a basis for requiring the Commissioner and/or his staff to come forward with affidavits as to their thought-processes and intentions in promulgating the regulations.[63]

The Government's motion for summary judgment as to Count IX of the complaint is granted.

## VII. Lawfulness of Particular Regulations

Count XI of the complaint, challenges many of the regulations as arbitrary, capricious, not in accordance with law, and unsupported by substantial evidence. The claim encompasses approximately 50 different sections and subsections of the regulations.[64]

Because the regulations at issue here were promulgated pursuant to the informal notice-and-comment rulemaking procedure set forth in 5 U.S.C. § 553, the applicable standard of review is whether the regulations are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs are simply incorrect in contending that the regulations are also to be reviewed under the "substantial evidence" standard set forth in 5 U.S.C. § 706(2)(E). The latter standard by its terms is applicable only to cases "subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute," neither of which conditions pertains here.

■■■ Plaintiffs rely upon a concurring opinion by Judge Lumbard in *National Nutritional Foods Ass'n v. Weinberger, supra,* in which Judge Lumbard expressed the view that even when the "arbitrary and capricious" standard is applicable, substantive rulemaking which is unsupported by substantial evidence should be set aside because it is an abuse of discretion to promulgate substantive regulations which are not supported by substantial evidence. The majority opinion, however, specifically held that the substantial evidence standard "is restricted to agency action in which an evidentiary hearing is required,"[65] and later opinions have reiterated this position.[66] Hence, the "arbitrary, capricious" standard is the standard of review applicable to the instant regulations.

Under this standard, a challenged regulation must be upheld if the agency considered the relevant factors and did not commit "a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,*

---

**62.** The agreements were executed in 1975 and 1976; the last substantial revision in the CGMP requirements (prior to the 1979 amendments) had been made in 1971.

**63.** *Cf. Hospital Association of New York State v. Toia,* 473 F.Supp. 917, 927 & n. 22 (S.D.N.Y. 1979) (where no contemporaneous administrative record of agency action exists, the question of what matters were considered by the agency may itself present an issue of fact).

**64.** The complaint states that "many provisions" of the regulations are invalid, but states that the specific invalid provisions could not be identified because the administrative record had not yet been filed with the Court. Plaintiffs subse-

quently specified the particular provisions alleged to be invalid in their memorandum in support of their motion for partial summary judgment. For the purposes of this motion we will deem the complaint to have been amended in accordance with plaintiffs' memorandum of law.

**65.** 512 F.2d at 700.

**66.** *See, e.g., Automobile Club of New York v. Cox,* 592 F.2d 658, 664, 673 (2d Cir.1979) (arbitrary, capricious standard applicable where evidentiary hearing was not required by law; agency action upheld as not arbitrary and capricious even though it did not appear to pass muster under substantial evidence standard).

401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). As stated in *Overton Park:* "Although [the court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."[67]

At the outset we note that plaintiffs' blunderbuss challenge to the validity of dozens of specific regulations, and plaintiffs' very style of argumentation, fail to indicate due recognition of the limited scope of review applicable to the regulations. Their method, in many cases, is merely to cite a regulation, state that comments objecting to the regulation were placed before the FDA, and that the FDA nevertheless promulgated the regulation. Clearly, unless a regulation on its face bears no rational relation to current good manufacturing practice, a party must do more than note the existence of objections in order to support the contention that the regulation is arbitrary and capricious. Moreover, plaintiffs' objections extend even to the most innocuous points: they challenge as arbitrary and capricious the requirements that hot water be provided for cleaning, that stock be rotated so that the oldest is used first, and that consultants retained by manufacturers have adequate education, training and experience to provide the advice for which they are retained.[68] It defies common sense to argue that requirements such as these are unrelated to the statutory goal of assuring the safety and purity of drugs.

Despite these reservations about the seriousness with which plaintiffs have put forward their objections, we have carefully reviewed their criticisms of the regulations and find the following points worthy of discussion.

A. Quality Control Unit

■ Many of the regulations challenged by plaintiffs relate to the duties to be performed by the quality control unit which each manufacturer must establish pursuant to 21 C.F.R. § 211.22. Plaintiffs challenge virtually every regulation governing the responsibilities of this unit. These regulations require the quality control unit to be responsible for approving all procedures or specifications affecting the quality and purity of the finished drug product (§ 211.22(c)), in particular for approving all production control procedures (§ 211.100(a)), drug products, drug components, packaging materials, drug products supplied by other manufacturers (§ 211.-22(a)) and laboratory controls (§ 211.-160(a)). The quality control unit must also approve the reprocessing (if any) of batches which do not initially conform to specifications (§ 211.115(b)), and must review complaints as to drug products if such complaints involve the possible failure of the drug product to meet its specifications (§ 211.198(a)).

Plaintiffs' primary complaint as to the regulations just listed is that they require the quality control unit to usurp functions as to which other personnel have more expertise, and in particular that the requirements as to the unit's approval of various matters trenches on management prerogatives. As discussed in Section VI, *supra,* the Commissioner addressed this criticism in the preamble to the final regulations,[69] and explained that the quality control unit is not required to take over the actual duties of other personnel, but simply to be responsible for overseeing quality assurance in the manufacturing operation. The preamble states, for example:

"The Commissioner intends to make the quality control unit responsible for ensuring that controls are implemented during manufacturing operations which assure drug product quality, not that the quality control unit actually perform each one of the duties. The Commissioner believes that, even under § 211.22,

---

**67.** *Id. See also State of Connecticut v. Environmental Protection Agency,* 696 F.2d 147, 155 (2d Cir.1982).

**68.** *See* 21 C.F.R. §§ 211.52, 211.86 and 211.34.

**69.** 43 Fed.Reg. 45013, 45032–35, ¶¶ 78, 89–91, 93–94, 97–98, 101–05 (1978).

management has the prerogative to organize its internal structure and assign responsibility as it deems appropriate, as long as some identifiable person or unit has at least those responsibilities assigned by the regulations to the quality control unit." [70]

Thus, nothing in the regulations prevents personnel with appropriate expertise from being part of the quality control unit, or requires that personnel without such expertise perform functions for which they are not qualified.

Moreover, plaintiffs' conclusory statements that certain matters should not be subject to the supervision of the quality control unit because they are "management prerogatives" are simply unsupported by the record or by common sense. For example, plaintiffs contend that the quality control unit should not have responsibility for approving packaging materials for drug products because such materials are unrelated to drug quality. The Commissioner, however, carefully explained the rationale for this requirement:

"Breakage of containers can cause product adulteration and mutilation of containers, which may result in product misbranding. The protection of drug products from such mechanical damage is just as much a function of the maintenance of drug product quality as placing light-sensitive products in light-resistant containers or labeling a product with its proper name and an accurate statement of its potency." [71]

Plaintiffs counter this explanation simply with the bald assertion that "[i]n truth and in fact, the type of packaging material to be used for the shipment of goods is a management prerogative totally unrelated to manufacturing practice." [72] Clearly the Commissioner's rationale for requiring quality control as to packaging material is sound, and is a matter within the FDA's

expertise which need not be based on elaborate scientific proof.

We have not discussed every regulation relating to the quality control unit which has been challenged by the plaintiffs. As noted in Section VI, *supra*, the Commissioner rejected some comments which criticized the regulations for not placing enough responsibility with the quality control unit [73] as well as rejecting some comments which made the opposite criticism of the regulations. In still other cases, the Commissioner modified the regulations in accordance with suggestions put forth in the comments.[74] The Commissioner explained his reasons for establishing the various duties of the quality control unit, and his conclusions, far from being arbitrary and capricious, appear eminently reasonable. Thus, we find no basis for invalidating any of the regulations governing the duties of the quality control unit.

B. Expiration Dating

The regulations require that manufacturers establish expiration dates for drug products through appropriate testing, and that the expiration date be placed on the label of the drug product. 21 C.F.R. § 211.137. Plaintiffs contend that these regulations are invalid because they constitute informational requirements rather than requirements as to manufacturing practices. They argue that regulations as to expiration dating must be promulgated under the labeling provisions of the Act, 21 U.S.C. § 352(h), rather than under the CGMP statute, and that rulemaking under section 352(h) requires an evidentiary hearing and other formal procedures not followed in promulgating the CGMP regulations.

The Government contends that section 352(h) is not the exclusive source of authority for rules as to expiration dating, and that the requirement of expiration dating is

70. 43 Fed.Reg. at 45013, 45033, ¶ 91 (1978).

71. 43 Fed.Reg. at 45013, 45034, ¶ 99 (1978).

72. Plaintiffs' Memorandum, *supra* note 31, p. 79.

73. A. 596–607.

74. *See* 43 Fed.Reg. 45013, 45032, ¶ 78 (1978).

clearly related to assuring the purity and safety of drugs, the goal of the CGMP statute.

 We address first plaintiffs' argument that expiration dating is purely an informational matter rather than an aspect of manufacturing practice which can be regulated under the CGMP statute. The argument is strained, and ignores the context in which the regulation appears as well as the Commissioner's explanation of the purpose of the regulation. The requirement that the expiration date be placed on the label of the drug product, set forth at 21 C.F.R. § 211.137, is related to the requirements of 21 C.F.R. § 211.166, which mandate that manufacturers perform the necessary testing to determine the stability of the drug and its components, and the point in time after which it may be subject to deterioration and loss of effectiveness or safety. Section 211.166 sets forth in general terms the nature of the testing that must be performed, and section 211.137 requires that the expiration date as determined by such testing be placed on the label of the drug product. The CGMP statute requires that good manufacturing practices be followed in order to assure that drugs are safe and have the identity, strength, quality and purity they are represented to have. As the Commissioner noted, this goal is clearly served by requirements as to expiration dating:

"Consumers of pharmaceuticals have a vital interest in having those products maintain the identity, strength, quality, and purity essential to render them safe and effective for use. The stability of a drug product during the period of time between its manufacture and its delivery to the patient can have a major influence on such identity, strength, quality, and purity.... [T]he use of expiration dating by the manufacturer will encourage the removal of outdated or aged stocks."[75]

In sum, it is clear that stability testing is an aspect of manufacturing practice which can properly be regulated under the CGMP statute, and such testing would be futile if the expiration date established by such testing did not appear on the drug product.

 Although there is nothing arbitrary or capricious in the Commissioner's determination that expiration dating is useful in assuring the safety and identity of drugs, the regulations would nevertheless be invalid if section 352(h) of the Act were the exclusive source of authority for such regulations, as plaintiffs argue. Section 352(h), which relates to misbranded drugs and devices, states in pertinent part that a drug will be deemed misbranded

"[i]f it has been found by the Secretary to be a drug liable to deterioration, unless it is packaged in such form and manner, and its label bears a statement of such precautions, as the Secretary shall by regulations require as necessary for the protection of the public health."

Regulations under section 352(h) must be promulgated in accordance with the procedures set forth in section 701(e) of the Act, 21 U.S.C. § 371(e), which includes the requirement of a full evidentiary hearing if requested by any interested person. Plaintiffs contend that the promulgation of expiration dating requirements under the CGMP statute constitutes an unlawful attempt to circumvent these formal rulemaking procedures.

While plaintiffs' argument is not frivolous, we find no clear indication in the language of section 352(h) or in the legislative history cited by plaintiffs that section 352(h) was intended to provide an exclusive source of authority for expiration dating requirements. Plaintiffs cite the following statement by Senator Copeland, in which he described the purpose of section 352(h) as follows:

"Special regulations are authorized for all drugs which are liable to deterioration in the course of their commercial distri-

**75.** 41 Fed.Reg. 6878, 6883 (1976). *See also* "The Dating of Pharmaceuticals," (proceedings of a conference, October 12–15, 1969, sponsored by the University of Wisconsin, Health Sciences Unit), A. 214.

bution. The purpose of these regulations will be to require methods of packaging to prolong the time the drug will remain potent, and special labeling to show the precautions to be taken in handling the drug to prevent its deterioration as well as to warn against its use after deterioration has occurred." [76]

However, although this statement indicates that one purpose of section 352(h) was to prevent the use of a product after deterioration has occurred, it provides little illumination of the question whether section 352(h) provides *exclusive* authority for requirements as to expiration dating. Section 352(h) was enacted in 1938; the CGMP statute was enacted much later, in 1962. It is clear that Congress, in establishing the requirement that current good manufacturing practices be followed so as to assure the safety, identity and purity of drugs, intended to give the FDA broad authority to accomplish that goal, and it is reasonable to assume that minor instances of overlap in the regulatory scheme were not necessarily intended to act as limitations on that authority. Since the FDA's interpretation of its authority under the CGMP statute is not clearly at odds with the language of that statute or of section 352(h), it is entitled to deference.[77]

We have examined plaintiffs' remaining complaints as to other specific regulations and find that no purpose would be served by further exhaustive discussion of plaintiffs' contentions. In each case, the Commissioner either provided an adequate and reasonable explanation for the action taken, or, in the few cases where the specific point raised was not discussed, the action is clearly supportable based upon the purpose of the CGMP statute and the FDA's expertise as to good manufacturing practices.

## VIII. *Summary*

The Government's motion for summary judgment on grounds of *res judicata* is granted as to Counts II, IV, VIII and X of the complaint, and on the merits as to Counts I, III, V, VI, VII, IX and XI. The plaintiffs' motion for partial summary judgment is denied. The complaint is dismissed.

It is so ordered.

---

**76.** 78 Cong.Rec. 8964 (1934).

**77.** *See United States v. Rutherford,* 442 U.S. 544, 553–54, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979).